[No. B197570. Second Dist., Div. Seven. Apr. 16, 2008.]

CALIFORNIA WATER IMPACT NETWORK, Plaintiff and Appellant, v. NEWHALL COUNTY WATER DISTRICT, et al., Defendants and Respondents. GATEKING PROPERTIES, et al., Real Parties in Interest and Respondents.

1466

1468

**COUNSEL**

Law Offices of Babak Naficy and Babak Naficy for Plaintiff and Appellant.

Lagerlof, Senecal, Gosney & Kruse and Thomas S. Bunn III for Defendants and Respondents.

Cox, Castle & Nicholson, Anne E. Mudge and Sarah E. Owsowitz for Real Parties in Interest and Respondents Gateking Properties and Mark T. Gates, Jr.

Carl K. Newton, City Attorney; Burke Williams & Sorensen, Geralyn L. Skapik and Timothy H. Irons for Real Party in Interest and Respondent City of Santa Clarita.

Kronick, Moskovitz, Tiedemann & Girard, Eric N. Robinson and Hanspeter Walter for Association of California Water Agencies as Amicus Curiae.

OPINION

**WOODS, J.**—Appellant California Water Impact Network (C-WIN) appeals from a judgment entered upon the trial court's order granting the respondents, the Newhall County Water District (the Water District) and real parties in interest, the City of Santa Clarita (the City) and GateKing Properties and Mark T. Gates, Jr.'s motion for judgment on the pleadings on C-WIN's petition for a writ of mandate. C-WIN's petition requested that the trial court set aside the water supply assessment (WSA) prepared by the Water District at the request of the City as a part of the City's environmental impact report (EIR) and review process required under the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) for a large-scale industrial/business park development proposed by GateKing Properties. The Water District and the City filed a motion for judgment on the pleadings, asserting among various arguments, that C-WIN's action was premature, and that a WSA is not subject to direct judicial review in mandamus proceedings. The trial court agreed, noting that WSA's are properly challenged as part of CEQA review.

■ On appeal, C-WIN asserts that it is entitled to directly challenge a WSA by way of either administrative or traditional mandamus because the WSA is a final determination by the water supplier concerning the sufficiency of the water supply for a proposed project, that it is not required to exhaust its administrative remedies with the City because the City lacks the authority to grant C-WIN the relief it seeks, and that without an opportunity to assert a direct challenge the water suppliers will be able to evade direct review of the WSA. We do not agree. As we shall explain the WSA is a technical informational document and not a "final" act or determination subject to direct mandamus review; C-WIN failed to exhaust its administrative remedies; the City had the authority to address C-WIN's claims concerning the WSA; and until the City certified the EIR and approved the project, the adequacy of the WSA was not subject to judicial challenge. In our view, the adequacy of WSA is properly challenged as a part of a challenge to an EIR after project approval. Consequently, the trial court here properly granted the motion for judgment on the pleadings and accordingly we affirm the judgment.

## *FACTUAL AND PROCEDURAL BACKGROUND*

GateKing Properties proposed building a 584-acre industrial/business park (the Project) located near the intersection of the Golden State Freeway (I-5)

and the Antelope Valley Freeway (I-14) in the City.[1] As required by CEQA, Public Resources Code section 21000 et seq., the City was required to prepare and certify an EIR before it could approve the Project. Because the industrial park met the definition of "project" under the Water Code,[2] the City was required to include a WSA in the EIR to assess the sufficiency of water supplies for the Project before the City could approve it. At the request of the City, the respondent Water District prepared the WSA for the Project. Thereafter, the City included the WSA in its EIR. On June 24, 2003, after a formal review and comment period the City certified the EIR (the 2003 EIR) and approved the Project.

The California Oak Foundation, the Santa Clarita Oak Conservancy and the Santa Clarita Organization for Planning the Environment[3] (collectively

---

[1] The original proposed project involved the subdivision of developed and undeveloped land in the City accommodating about 4.45 million square feet of industrial/commercial development of 170.1 acres, with an additional 64.3 acres consisting of rights-of-way (including public streets) and water wells. The remaining 349.6 acres were to include a combination of slopes, trails and areas within the industrial/commercial lots that would remain undeveloped, as well as 220.6 acres of dedicated open space. (See *California Oak Foundation v. City of Santa Clarita* (2005) 133 Cal.App.4th 1219, 1224 [35 Cal.Rptr.3d 434].) As ultimately approved by the City, the site size was reduced to 508.2 acres (75.8 acres having been donated to the City). The buildable area of the project was reduced to 161 acres, accommodating about 4.2 million square feet of industrial/commercial development, and 207.6 acres of dedicated open space. (*Ibid.*)

[2] The Water Code section provides in pertinent part:

"(a) 'Project' means any of the following:

"(1) A proposed residential development of more than 500 dwelling units.

"(2) A proposed shopping center or business establishment employing more than 1,000 persons or having more than 500,000 square feet of floor space.

"(3) A proposed commercial office building employing more than 1,000 persons or having more than 250,000 square feet of floor space.

"(4) A proposed hotel or motel, or both, having more than 500 rooms.

"(5) A proposed industrial, manufacturing, or processing plant, or industrial park planned to house more than 1,000 persons, occupying more than 40 acres of land, or having more than 650,000 square feet of floor area.

"(6) A mixed-use project that includes one or more of the projects specified in this subdivision.

"(7) A project that would demand an amount of water equivalent to, or greater than, the amount of water required by a 500 dwelling unit project.

"(b) If a public water system has fewer than 5,000 service connections, then 'project' means any proposed residential, business, commercial, hotel or motel, or industrial development that would account for an increase of 10 percent or more in the number of the public water system's existing service connections, or a mixed-use project that would demand an amount of water equivalent to, or greater than, the amount of water required by residential development that would represent an increase of 10 percent or more in the number of the public water system's existing service connections." (Wat. Code, § 10912, subds. (a), (b).)

[3] California Oak Foundation, the Santa Clarita Oak Conservancy and the Santa Clarita Organization for Planning the Environment are not parties to the petition underlying this appeal.

know as SCOPE) petitioned the trial court for a writ of mandate.[4] SCOPE requested the trial court order the City to set aside its certification of the final EIR and related resolutions approving the Project. SCOPE claimed that the approval of the Project, and the EIR supporting it, violated CEQA because the EIR overstated and misstated the extent of reliable sources of water.

The trial court found the EIR to be adequate and denied the petition for a writ of mandate in March 2004. SCOPE appealed arguing among other contentions that insufficient evidence existed to support the EIR's conclusion that sufficient water supplies existed for the project.[5] (See *California Oak Foundation v. City of Santa Clarita, supra,* 133 Cal.App.4th at pp. 1223–1224.) Division Eight of this district concluded the trial court erred in approving the EIR because the section of the EIR discussing water supplies was inadequate, but found no other defects in the EIR, or other reversible errors. (*Id.* at p. 1244.) Specifically Division Eight found that the EIR did not adequately discuss or examine the legal uncertainties surrounding the availability of 41,000-acre feet per year (afy) of imported water and failed to fully explain the conclusion that water supplies were sufficient notwithstanding the uncertainties. (*Id.* at pp. 1236–1243.) Division Eight ordered the trial court to decertify the 2003 EIR for the Project and to retain jurisdiction until the lower court determined that the City's revised EIR complied with CEQA. (133 Cal.App.4th at p. 1245.) In February 2006, the trial court issued a writ of mandate ordering the City to decertify the 2003 EIR and to stay the City's Project approvals until it prepared and certified a revised EIR that was consistent with the opinion expressed in *California Oak Foundation* and which complied with CEQA. The lower court further directed the City to file a return to the writ to demonstrate compliance by mid-September 2006.

Thereafter, the City requested the Water District to prepare and adopt a new WSA for the Project. The Water District prepared a new WSA. Prior to the adoption of the new WSA by the Water District, C-WIN objected and urged the Water District not to approve the new WSA as proposed. On March 9, 2006, the Water District's board considered and adopted the new WSA at its regular meeting.

---

[4] C-WIN was not a party to SCOPE's petition. C-WIN identifies and describes itself as "a 501c(3) non-profit corporation, whose mission is to promote equitable and environmental sensitive uses of California water, including instream uses, through research, planning, advocacy, public education and litigation."

[5] SCOPE also argued on appeal the City violated its Ridgeline Preservation and Hillside Development Ordinance by granting the Project an exemption from the ordinance as an "innovative development" alternative and that the EIR was defective because it did not require adequate surveys of the site to determine the presence or absence of several rare plant species prior to certification of the Project, and otherwise failed to require adequate mitigation measures with respect to these plant species. (See *California Oak Foundation v. City of Santa Clarita, supra,* 133 Cal.App.4th at pp. 1223–1224, 1242–1245.)

On May 16, 2006, before the City had an opportunity to review and evaluate the new WSA and incorporate it into the revised EIR,[6] C-WIN filed a petition in the superior court for a preemptory writ of mandate (under Code Civ. Proc., §§ 1094.5 & 1085 as well as Wat. Code, § 10910 et seq.) and a complaint for declaratory and injunctive relief against the Water District[7] alleging the new WSA was legally deficient and misleading in a number of respects.[8]

In October of 2006 the Water District, the City and GateKing filed a motion for judgment on the pleadings on the petition, arguing among other things that (1) the WSA was a technical informational document and not a final act or determination subject to review under Code of Civil Procedure section 1094.5; (2) a WSA was neither a ministerial or legislative action subject to review under Code of Civil Procedure section 1085; (3) C-WIN had failed to exhaust its administrative remedies and that C-WIN must object to the lead agency (i.e., the City) first and that until the City had recertified the EIR and approved the Project the adequacy of the WSA was not subject to judicial challenge; (4) C-WIN lacks standing to challenge the WSA and that C-WIN

---

[6] In July of 2006, after the City received the new WSA from the Water District, the City prepared an additional analysis of the water supplies for the Project and incorporated it into a revised EIR. After a public comment period and public hearing on the matter the City recertified on July 11, 2006. In August 2006, the City filed a return to the writ (in the *California Oak Foundation* case) contending that the revised WSA and EIR complied with the opinions expressed by Division Eight in the *California Oak Foundation* opinion. In October of 2006, SCOPE (but not C-WIN) objected to the discharge of the writ, arguing that the recertified EIR WSA was inadequate. In mid-August 2007, the trial court discharged the writ and issued a "Statement of Decision" in which it found, among other things, that the recertified EIR adequately examined the legal uncertainties surrounding the availability of 41,000 afy. SCOPE's appeal in the matter is now pending.

[7] GateKing and the City were named as real parties in interest in C-WIN's petition.

[8] In particular, C-WIN sought to invalidate and set aside the new WSA, asserting it contained "false and misleading claims and incorrect legal analysis in connection with 'entitlements' to water transfers from the State Water Project . . . , particularly the controversial and uncertain 41,000 afy Kern-Castaic transfer that is currently the subject of two separate legal challenges." C-WIN also asserted WSA falsely claimed that the 41,000 afy transfer is "permanent" even though it was the ongoing subject of a statewide environmental review of the Department of Water Resources (DWR). C-Win further argued the WSA misleadingly and falsely claimed (1) the 41,000 afy was "available for use" despite uncertainty of that conclusion pending the final outcome of DWR's ongoing programmatic review of the other water supply agreements such as the Monterey Amendments; and (2) that the pending judicial challenges to Castaic Lake Water Agency's stand-alone EIR for the 41,000 afy did not affect the reliability of the transfer. C-WIN maintained the WSA contained other legal flaws including improper reliance on Castaic Lake Water Agency's 2005 Urban Water Management Plan, a failure to consider the potential impact of *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674 [39 Cal.Rptr.3d 189] on State Water Project deliveries, inaccurate analysis of groundwater supplies and a failure to adequately consider the impacts of global warming on water supplies.

had failed to name the proper respondent in the action; and (5) the Water Code does not provide for private third party claims challenging a WSA.

On January 11, 2007, the trial court granted the motion for judgment on the pleadings on the grounds articulated by the Water District, the City and GateKing, noting that "WSA's are not immune from judicial review, but must be challenged and reviewed as part of CEQA review." The court dismissed C-WIN's petition with prejudice and entered judgment against C-WIN.

C-WIN timely appeals.

## DISCUSSION

On appeal, C-WIN asserts the court erred in granting the judgment on the pleadings because it is entitled to assert a direct challenge to the adequacy of the WSA in a mandamus proceeding under either Code of Civil Procedure section 1094.5 or section 1085. As we explain below, we do not agree.

Before turning to the underlying contentions, however, we address one preliminary matter. Specifically we examine the effect of the trial court's Statement of Decision in the *California Oak Foundation* case on the matter before us. Indeed, C-WIN's underlying complaints concerning the WSA in this matter are nearly identical to those SCOPE asserted concerning the revised EIR, which the trial court rejected in discharging the writ in the *California Oak Foundation* case.

I. *Effect of the Trial Court's Statement of Decision in* California Oak Foundation

In January 2008, this court requested that the parties submit additional briefing in this appeal on the legal effect, if any, of the trial court's conclusions in the Statement of Decision in *California Oak Foundation* on the sufficiency of the revised WSA. Respondents asserted C-WIN's claims are the same as those asserted by the plaintiffs in *California Oak Foundation*, contending the trial court's Statement of Decision in *California Oak Foundation* resolved the underlying contentions in C-WIN's petition for a writ of mandate filed in this case. Acknowledging the Statement of Decision is now pending on appeal, respondents further maintain that when the Statement of Decision becomes final the appeal in this matter will be moot and thus, they requested that this court stay this appeal until the appeal of the Statement of Decision in *California Oak Foundation* is resolved. C-WIN conceded this appeal might become moot based on the outcome of the appeal in *California Oak Foundation*, and joined in the request that we stay this appeal.

■ We deny the request to stay this appeal. Even if the final decision in *California Oak Foundation* effectively moots C-WIN's underlying challenge to the revised WSA, the *California Oak Foundation* decision will not resolve the significant matters of first impression at issue in this appeal. The courts have developed various doctrines to permit the appellate review of a case in which it is no longer possible to remedy the injury giving rise to the request for review. One exception to the mootness doctrine applies to those controversies that are capable of repetition and yet evade review. (See *Conservatorship of Wendland* (2001) 26 Cal.4th 519, 524, fn. 1 [110 Cal.Rptr.2d 412, 28 P.3d 151]; *District Election etc. Committee v. O'Connor* (1978) 78 Cal.App.3d 261, 265–266 [144 Cal.Rptr. 442].) This is such a case. In our view, this appeal poses an issue of important public interest concerning whether WSA's are subject to direct judicial challenge by non-lead-agency third parties prior to the certification of the EIR and project approval. In addition, because this appeal does not itself concern the adequacy of the WSA the issues before us are necessarily distinct from those pending in the *California Oak Foundation.* Given the increasing public focus on and interest in water supply issues as they relate to land use and development we have no doubt that a challenge of this nature will arise again, and yet given the statutory timeframes imposed upon lead agencies under CEQA, the issues presented by this appeal may evade review.

Consequently, this court exercises its discretion to resolve questions presented in this appeal even though the resolution of the *California Oak Foundation* might moot the underlying relief sought by C-WIN in its petition.

## II. *Standard of Review*

Review of an order granting a motion for judgment on the pleadings is governed by the same standard applicable to reviewing an order sustaining a general demurrer. This court will examine only the face of the pleadings, together with matters subject to judicial notice, to determine whether such facts are sufficient to constitute a cause of action. A defendant is entitled to a judgment on the pleadings when it appears from the face of the complaint (or on those matters judicially noticed) that the complaint is barred as a matter of law. (*Saltarelli & Steponovich v. Douglas* (1995) 40 Cal.App.4th 1, 5 [46 Cal.Rptr.2d 683].) We review the pleadings de novo to determine whether the trial court erred in granting the motion. (*Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 166 [59 Cal.Rptr.3d 142, 158 P.3d 718].)

III. *The Trial Court Properly Granted Judgment in This Matter*

On appeal C-WIN argues the trial court erred in dismissing the petition for a writ of mandate.[9] C-WIN asserts that it was entitled to relief under the Code of Civil Procedure, either section 1085 or section 1094.5, arguing that the new WSA was subject to direct judicial challenge and the Water District is a proper respondent in the proceedings. C-WIN maintains the WSA constitutes a "final" determination that "commits" the Water District to a "course of action with serious implications," including a commitment that the Water District would supply water to the Project if it was approved. C-WIN also asserts that it is not required to "exhaust" its remedies with the City because the City could not grant it the relief C-WIN sought and thus absent a direct judicial challenge the WSA will evade review.

To assess C-WIN's contentions first requires an understanding of the law governing CEQA and the preparation of WSA's and their use in the process of preparing and certifying EIR's. It is to the consideration of these laws which we now turn our attention.

A. *CEQA and EIR's in General*

■ As Division Eight noted in *California Oak Foundation* an "EIR is an informational document. Its purpose is to provide public agencies, and the public, with detailed information about the effect a proposed project is likely to have on the environment; to list ways in which the significant effects of a project might be minimized; and to indicate alternatives to a project. ([Pub. Resources Code,] § 21061.) Before approving a project, the lead agency— here, the City—must find either that the project's significant environmental effects identified in the EIR have been avoided or mitigated, or that unmiti-gated effects are outweighed by the project's benefits." (*California Oak Foundation v. City of Santa Clarita, supra*, 133 Cal.App.4th at p. 1225, citing *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390–393 [253 Cal.Rptr. 426, 764 P.2d 278], citing §§ 21002, 21002.1, 21081.) "If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees." (*Laurel Heights, supra*, 47 Cal.3d at p. 392.)

---

[9] On appeal C-WIN does not claim the court erred with respect to dismissing the complaint for declaratory or injunctive relief, and thus we deem any potential arguments as to those claims for relief waived.

B. *Historical Background of the WSA law, the WSA Framework and Requirements and the WSA's Role in the EIR and CEQA Review*

In 1995 the California Legislature enacted Senate Bill No. 901 (1995–1996 Reg. Sess.) (Senate Bill 901) (which later was codified at Wat. Code, §§ 10910–10915) (collectively referred to as the WSA law) as an effort to ensure that water needs and supplies were analyzed by cities and counties before major developments were built.

Under the version of Water Code section 10910 enacted in 1995, any city or county (i.e., the lead agency) preparing an EIR for a qualifying project was required to request each potential water supplier for a WSA. The assessment was based on the supplier's most recent urban water management plan and would indicate whether the supplier could meet the water supply needs of the project. Senate Bill 901, however, applied only to certain types of projects that exceeded a defined size.[10] The WSA had to indicate whether in the view of the water supplier there would be sufficient water to meet the project's needs over a projected 20-year period that included single dry water years and multiple dry water years. If the supplies were inadequate, the lead agency conducting the environmental review had to be notified and the lead agency was required to include information received as a result of the assessment in the EIR. After reviewing the assessments, the lead agency was required to make the final determination on whether sufficient water supply existed to meet the anticipated demand of the project.[11] As originally enacted in 1995 the WSA law framework did not contain any provisions to ensure that water suppliers provided water assessments and no mechanisms for ensuring that the assessments would be prepared or considered in the event that the water suppliers

---

[10] As originally enacted Water Code section 10913 defined "project" as: residential developments of more than 500 units; shopping centers or business establishments employing more than 1,000 persons or containing more than 500,000 square feet of floor areas; office buildings employing more than 1,000 persons or containing more than 250,000 square feet of floor area; hotels or motels containing more than 500 rooms; industrial, manufacturing, or processing plants or industrial parks housing more than 1,000 persons occupying more than 40 acres or containing more than 650,000 square feet of floor area; or mixed-use projects that demand as much or more water than a 500-unit residential project. Section 10913 was repealed in 2001 and as indicated in footnote 2, *ante*, the definition was broadened and moved to Water Code section 10912.

[11] An early version of Senate Bill 901 provided that if the water supplier found in its assessment that its water supplies were or would be insufficient to meet the reasonable needs, that finding would constitute a *significant effect* on the environment for purposes of CEQA. Placing the ultimate determination of significant environmental effects on the water suppliers aroused opposition to the bill. Opponents argued the provision would remove local land use decisionmaking authority from cities and counties and shift it to local water suppliers. (See Sen. Agriculture & Water Resources Com., Analysis of Sen. Bill No. 901 (1995–1996 Reg. Sess.) Apr. 4, 1995.)

fail to provide them. (See Wat. Code, § 10910 et seq. (1995); Tepper, *New Water Requirements for Large-Scale Developments* (Jan. 2005) 27 L.A. Law. 18.)

Notwithstanding the framework provided in Senate Bill 901, it soon became apparent to the courts that the water supply issues were not being adequately considered by lead agencies prior to the approval of a number of large-scale projects. (See, e.g., *Stanislaus Heritage Project v. County of Stanislaus* (1996) 48 Cal.App.4th 182, 200 [55 Cal.Rptr.2d 625] [court invalidated an EIR for a large-scale residential development where the WSA addressed only the first five years of a 25-year phased project]; *Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 370–371 [110 Cal.Rptr.2d 579] [Court of Appeal invalidated an EIR based on findings including that the water supply analysis had not adequately addressed secondary water sources].)

The Legislature also observed the noncompliance with Senate Bill 901, and in 2001 enacted Senate Bill No. 221 (2001–2002 Reg. Sess.) (Senate Bill 221) and Senate Bill No. 610 (2001–2002 Reg. Sess.) (Senate Bill 610), designed to correct perceived deficiencies in Senate Bill 901.[12] Senate Bill 221 and Senate Bill 610 were intended to ensure that local land use authorities would thoroughly consider the availability of water supplies before approving major new developments. Senate Bill 610 was intended to amend the then existing Water Code section 10910 et seq. and applied to a wide range of residential, commercial, and industrial projects, while Senate Bill 221, which later was codified as Government Code section 66473.7 applied only to residential housing projects.[13]

---

[12] A comment in support of Senate Bill 610 in the Senate Agriculture & Water Resources Committee report observed: "A recent study of environmental documents for commercial, industrial, and residential development shows a high level of non-compliance with SB 901." (Sen. Agriculture & Water Resources Com. Analysis of Sen. Bill No. 610 (2001–2002 Reg. Sess.) Apr. 24, 2001, p. 4.) An examination of 119 Bay Area large-scale development projects revealed that "only 2% complied with all of the requirements of SB 901. Of those that did not comply, 24% did not identify any water supply." (*Ibid.*) The comment further stated that Senate Bill 610 "ensures that all commercial, industrial and residential projects have an identified source of water and that city and county planning agencies have sufficient information to determine the adequacy of those supplies before deciding to approve or deny a development project."

[13] Government Code section 66473.7 also known as the "water verification law" applies to residential subdivisions of more than 500 residential units, and requires that cities and counties demonstrate an adequate water supply before they approve a tentative map for the residential development. Adequacy of the water supply may be established by obtaining *written verification* from a public water supplier confirming the total water supplies available within a 20-year period sufficient to meet the projected demand associated with the proposed subdivision. (Gov. Code, § 66473.7, subds. (a)(1)–(2), (b)(1).) Under Government Code section 66473.7,

Senate Bill 610 focused on improving the Senate Bill 901 process by strengthening urban water management plans as well as the connection between water supply assessment and the plans (or the equivalent level of analysis if there is no plan).[14]

■ As amended in 2001, Water Code section 10910 requires that, before approving any projects as defined in Water Code section 10912, the lead agency must request a WSA from the water supplier most likely to serve the project. (Wat. Code, § 10910, subd. (b).)[15] The WSA must evaluate whether the total water supplies during a 20-year period will meet the projected water demand of the proposed project. (Wat. Code, § 10910, subd. (c)(4).) Section 10910, subdivision (c)(2) allows the public water supplier to incorporate into the WSA information from the water system's most recent urban water management plan, if the plan has taken the project demand into account. But if the plan has not taken the proposed project into account, or the public water system has no urban water management plan, the WSA for the project shall include a "discussion" with regard to whether the public water system's total projected water supplies available during normal, single-dry, and multiple-dry water years during a 20-year projection will meet the projected water demand associated with the proposed project. (Wat. Code, § 10910, subd. (c)(3).) ■ Section 10910 further states that the WSA shall include an identification of any existing water supply entitlements, water rights, or water service contracts relevant to the identified water supply for the proposed project, and a description of the quantities of water received in prior years by the public water system under the existing water supply entitlements, water rights, or water service contracts. (Wat. Code, § 10910, subd. (d)(1).)[16] In addition, section 10910 indicates that if the water supply for the proposed project relies on ground water supplies, additional specific information must be provided in the WSA.[17] (See Wat. Code, § 10910,

subdivision (b)(4) cities, counties, and *other interested parties* are authorized to institute proceedings for a writ of mandate against a water supplier for failing to respond to a request for a written letter verification.

[14] When Governor Davis signed Senate Bill 610 into law in 2001, he noted that it was intended to " 'coordinate local water supply and land use decisions' " and to provide the " 'necessary foundation for developing comprehensive state water policies. . . .' " (Historical and Statutory Notes, 56B West's Ann. Pub. Resources Code (2007 ed.) foll. § 21151.9, p. 106.)

[15] If the lead agency is unable to identify a potential water supplier, it must prepare the required water supply assessment in consultation with the local agency formation commission and any water supplier with a service area that overlaps or is adjacent to the project site. (Wat. Code, § 10910, subd. (b).)

[16] Subdivision (d) also describes in detail the types of evidence the water supplier can use to demonstrate the existing entitlements, water rights or water service contracts held by the provider. (Wat. Code, § 10910, subd. (d)(2)(A)–(D).)

[17] Additional data about the needed groundwater, include, inter alia: (1) a review of any information in the supplier's current urban water management plan that is relevant to the water

subd. (f).) Water Code section 10911 provides that "[i]f, as a result of its assessment, the public water system concludes that its water supplies are, or will be, insufficient, the public water system shall provide to the city or county its plans for acquiring additional water supplies, setting forth the measures that are being undertaken to acquire and develop those water supplies." (Wat. Code, § 10911, subd. (a).) ■ Notwithstanding the assessments and projections that WSA law requires the water supplier to prepare and submit to the lead agency, Water Code section 10914 provides that the WSA provisions were *not* "intended to create a right or entitlement to water service or any specific level of water service" or to "impose, expand, or limit any duty concerning the obligation of a public water system to provide certain service to its existing customers or to any future potential customers." (§ 10914, subds. (a), (b).)

■ Section 10910, subdivision (g) of the Water Code specifies the timeframe for preparing and submitting a WSA. Specifically, the "governing body" of each public water system is required to "approve" the WSA at a regular or special meeting and must submit the WSA to the lead agency not later than 90 days from the date on which the request was received. (Wat. Code, § 10910, subd. (g)(1).) In addition, subdivision (g)(3) further states that if the water supplier fails to submit the WSA the lead agency may seek a writ of mandamus to compel the water supplier to comply. (Wat. Code, § 10910, subd. (g)(3).)

■ After the water supplier provides the WSA to the lead agency, the law further dictates that the lead agency shall include the WSA in any CEQA environmental documents, namely the EIR the lead agency prepares for the project. (Wat. Code, § 10911, subd. (b).) Section 10911 further provides the lead agency "may include in any environmental document an evaluation of any information included in" the WSA. (Wat. Code, § 10911, subd. (c).) Further the lead agency "shall determine, based on the entire record, whether projected water supplies will be sufficient to satisfy the demands of the project, in addition to existing and planned future uses. If the city or county determines that water supplies will not be sufficient, the city or county shall include that determination in its findings for the project." (*Ibid.*)

---

supply, (2) a description of the groundwater basin that the project proposes to use, (3) a copy of any court order or decree adjudicating the right to pump water from the basin, (4) information as to whether the DWR has determined that a basin with an adjudicated order or decree is or will be overdrafted under current management conditions, (5) a detailed description of efforts to eliminate the overdraft condition, (6) a detailed description and analysis of the amount and location of the groundwater the supplier has pumped from the basin in the past five years, and (7) an analysis of whether the groundwater to be pumped from the basin will meet the project demand. (See Wat. Code, § 10910, subd. (f).)

With this legal framework in mind, we turn to C-WIN's specific claims on appeal.

### C. *C-WIN's Claims for Mandamus Relief*

On appeal C-WIN argues it may assert a direct challenge against the Water District assailing the adequacy of the Water District's WSA for the Project pursuant to either Code of Civil Procedure section 1094.5 or section 1085.[18]

█ A party may seek to set aside an administrative decision for failure to comply with CEQA by petitioning for either administrative mandamus (Code Civ. Proc., § 1094.5) or traditional mandamus (Code Civ. Proc., § 1085). (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 566 [38 Cal.Rptr.2d 139, 888 P.2d 1268].)

█ The appropriate type of mandate is determined by the nature of the administrative action or decision under review. In general, "quasi-judicial" or "adjudicative acts," that is, acts that involve the actual application of a rule to a specific set of existing facts are reviewed by administrative mandamus under Code of Civil Procedure section 1094.5. (*Ohton v. Board of Trustees of California State University* (2007) 148 Cal.App.4th 749, 766 [56 Cal.Rptr.3d 111].)

█ More specifically, a petition for administrative mandamus under Code of Civil Procedure section 1094.5 is appropriate when the party seeks review of a final "determination, finding, or decision of a public agency, made as a result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency . . . ." (Pub. Resources Code, § 21168; see *Langsam v. City of Sausalito* (1987) 190 Cal.App.3d 871, 879 [235 Cal.Rptr. 672] ["It is well established that the intent of the Legislature in enacting [Code

---

[18] C-WIN's petition and complaint also relied on Water Code section 10910 as a basis for relief. C-WIN has since abandoned any contention that the Water Code provides for a private right of action against the water district to ensure compliance with the provisions of the WSA law. ("Water Code § 10910 et seq. does not provide for a private right of action.") This concession is proper. While section 10910, subdivision (g)(3) allows a lead agency to seek judicial intervention to obtain a water supplier's compliance with the WSA law, nothing in the statutory framework affords a private actor the same rights of enforcement. (See Wat. Code, § 10910 et seq.; compare water verification law, Gov. Code § 66473.7, subd. (b)(2) ["If the public water system fails to deliver the written verification as required by this section, the local agency or other interested party may seek a writ of mandamus to compel the public water system to comply"], with *Friends of the Santa Clara River v. Castaic Lake Water Agency* (2004) 123 Cal.App.4th 1 [19 Cal.Rptr.3d 625] [court considered a challenge brought by private nonprofit corporations against water supplier based on claim that the water supplier's urban water management plan violated Urban Water Management Planning Act (Wat. Code, § 10610 et seq.)].)

of Civil Procedure section] 1094.5 was to authorize '. . . judicial review only of the exercise by an administrative agency of an adjudicatory or quasi-judicial function.' "]; see also Cal. Administrative Mandamus (Cont.Ed.Bar 1989) § 1.1, p. 2 [administrative mandamus is the "procedure used to obtain judicial review of adjudicatory decisions (*i.e.*, decisions that determine what the facts are in relation to specific private rights or interests)"].) ▆ In an action to set aside an agency's decision under Code of Civil Procedure section 1094.5, the trial court's inquiry extends only to whether a prejudicial abuse of discretion has occurred. Abuse of discretion occurs if the agency has not proceeded in a manner required by law, or if its decision is not supported by substantial evidence. (*Laurel Heights, supra*, 47 Cal.3d at p. 392.)

▆ In contrast, the actual formulation of the rule itself constitutes a "quasi-legislative" act and is reviewed by ordinary mandate. (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 168–169 [188 Cal.Rptr. 104, 655 P.2d 306] [adoption of guidelines interpreting coastal access provisions constituted quasi-legislative agency action because guidelines governed future permit decisions rather than the application of the rules to a particular case and thus were reviewed under Code Civ. Proc., § 1085 rather than Code Civ. Proc., § 1094.5]; *Wal-Mart Stores, Inc. v. City of Turlock* (2006) 138 Cal.App.4th 273, 299–300 [41 Cal.Rptr.3d 420] [traditional mandate the proper vehicle to challenge constitutionality of city's zoning ordinance].) A petition for traditional mandamus is appropriate in other actions brought to attack, review, set aside, or void a quasi-legislative (where in general no evidentiary hearing is held)[19] or ministerial determination, or decision of a public agency. (*Ohton v. Board of Trustees of California State University, supra*, 148 Cal.App.4th at p. 766; see also Pub. Resources Code, § 21168.5; *Del Mar Terrace Conservancy, Inc. v. City Council* (1992) 10 Cal.App.4th 712, 726–729 [12 Cal.Rptr.2d 785]; *Langsam v. City of Sausalito, supra*, 190 Cal.App.3d 871, 879 ["where an agency is exercising a quasi-legislative function, judicial review must proceed under ordinary or traditional mandamus"].) ▆ The trial court reviews an administrative action pursuant to Code of Civil Procedure section 1085 to determine whether the agency's action was arbitrary, capricious, or entirely lacking in evidentiary support, contrary to established public policy, unlawful, procedurally unfair, or whether the agency failed to follow the procedure and give the notices the law requires. (*Lewin v. St. Joseph Hospital of Orange* (1978) 82 Cal.App.3d 368, 387 [146 Cal.Rptr. 892].) Even though mandate will not lie to control a

---

[19] The determination of whether Code of Civil Procedure section 1094.5 or 1085 applies does not depend on whether the agency is required by statute to hold an evidentiary hearing in the matter, but instead turns on the nature of the challenged action. (See *Western States Petroleum Assn. v. Superior Court, supra*, 9 Cal.4th at p. 567 [Reaffirming the view that "quasi-legislative actions must be challenged in traditional mandamus proceedings rather than administrative mandamus proceedings even if the administrative agency was required by law to conduct a hearing and take evidence"].)

public agency's discretion, that is to say, force the exercise of discretion in a particular manner, it does lie to command the exercise of discretion—to compel some action upon the subject involved. (*Sunset Drive Corp. v. City of Redlands* (1999) 73 Cal.App.4th 215, 222 [86 Cal.Rptr.2d 209] [traditional mandamus appropriate vehicle to compel city to complete an EIR because preparation of the document was a duty compelled by law]; *State Bd. of Education v. Honig* (1993) 13 Cal.App.4th 720, 741 [16 Cal.Rptr.2d 727] ["Mandate will lie only where (1) the respondent has a clear, present, and usually ministerial duty to act, and (2) the petitioner has a clear, present, and beneficial right to performance of that duty."].)

Here C-WIN asserts that Code of Civil Procedure section 1094.5 should apply because the WSA was approved, as required by Water Code section 10910, at a meeting where the public was invited to comment. C-WIN asserts that the "meeting" constituted an "evidentiary hearing" under Code of Civil Procedure section 1094.5. In the alternative, C-WIN argues that traditional mandamus under Code of Civil Procedure section 1085 would also be appropriate because it is available to "challenge agency abuse of discretion."[20]

For its part, the Water District asserts neither form of mandamus is appropriate in this case. The Water District maintains the "meeting" at which it approved the WSA does not qualify as an evidentiary hearing for the purposes of Code of Civil Procedure section 1094.5. The Water District asserts that although the meetings of the Water District's governing board are open and afford the public an opportunity to comment on agenda items, there is no requirement that "evidence" be offered at the meetings. Consequently, the Water District maintains that administrative mandamus is not available. In addition the Water District argues that C-WIN may not avail itself of traditional mandamus under Code of Civil Procedure section 1085 because the determination at issue—the contents of the WSA and its adequacy—are not quasi-legislative or ministerial acts. The Water District argues that the contents of the WSA are factual determinations and assessments based on the discretion and expert opinions of its professional staff.

This court need not decide which form of mandate would apply here, because the petition fails to satisfy prerequisites common to both administrative and traditional mandamus review. C-WIN has failed to demonstrate

---

[20] C-WIN takes the "abuse of discretion" language out of context. The use of the term "abuse of discretion" in the context of traditional mandate refers to situations were the agency either failed to exercise its discretion or where the agency failed to perform an act clearly required by the statute. (See *Wood v. Strother* (1888) 76 Cal. 545, 548–549 [18 P. 766] [cited by C-WIN]; *Manjares v. Newton* (1966) 64 Cal.2d 365, 370 [49 Cal.Rptr. 805, 411 P.2d 901].)

(1) that the WSA constitutes a final determination, finding, or decision of a public agency as that term is used in the context of administrative and traditional mandamus; or (2) that C-WIN exhausted its administrative remedies. (See *Lopez v. Civil Service Com.* (1991) 232 Cal.App.3d 307, 314–315 [283 Cal.Rptr. 447] [the same principles, requirements and limitations, including finality and the exhaustion doctrine apply to writ proceedings under Code Civ. Proc., §§ 1094.5 & 1085]; *Eight Unnamed Physicians v. Medical Executive Committee* (2007) 150 Cal.App.4th 503, 511 [59 Cal.Rptr.3d 100] [exhaustion requirement applies whether relief is sought by traditional or administrative mandamus].)

### 1. *Finality*

██ "A decision attains the requisite administrative finality when the agency has exhausted its jurisdiction and possesses 'no further power to reconsider or rehear the claim.'" (*Long Beach Unified Sch. Dist. v. State of California* (1991) 225 Cal.App.3d 155, 169 [275 Cal.Rptr. 449].) Finality may be defined either expressly in the statutes governing the administrative process or it may be determined from the framework in the statutory scheme. (See *Du Four v. Unemployment Ins. Appeals Bd.* (1975) 49 Cal.App.3d 863, 867–868 [122 Cal.Rptr. 859] (*Du Four*) [court rejected aggrieved employee's effort to "short-circuit" three-tiered system of determination and review provided in statutory scheme by seeking direct judicial review of an unemployment insurance referee's decision on benefits where statute provided for direct review by an appeals board].) Until a public agency makes a final decision, the matter is not ripe for judicial review. (*San Bernardino Public Employees Assn. v. City of Fontana* (1998) 67 Cal.App.4th 1215 1226–1227 [79 Cal.Rptr.2d 634] [where city had not yet agreed in a memorandum of understanding to reduce employee retiree benefits, Court of Appeal concluded that trial court prematurely granted a petition for a writ of mandate compelling the city to refrain from reducing or eliminating retiree benefits].)

The WSA law does not expressly state when a WSA becomes "final" for the purpose of mandamus relief or for the purpose of requesting other judicial intervention. Nonetheless, finality can be determined from a review of the WSA law framework.

██ Where, as here, a lead agency requests a water supplier prepare and adopt a WSA for a particular project, the water supplier's duty in so doing is defined and set forth in detail in Water Code sections 10910 and 10911. As described elsewhere, the water system provider most likely to supply the project must evaluate and prepare an assessment of whether the water supplies will meet the projected needs of the project, and if the water supplier determines that water supplies are not sufficient, the water supplier must

describe its plans for acquiring additional water supplies. This notwithstanding, the code is also clear that nothing in the WSA itself or the statutes governing its preparation actually imposes any duty upon the water supplier to provide water services to the project. (See Wat. Code, § 10914.) Thus, in our view the WSA is, as the respondents and the amicus curiae posit, a technical, informational advisory opinion of the water provider. Though the WSA is required by statute to include an assessment of certain statutorily identified water supply issues and is required to be included in the EIR, the WSA's role in the EIR process is akin to that of other informational opinions provided by other entities concerning potential environmental impacts—such as traffic, population density or air quality. The fact that the duties of the water provider in preparing the WSA and responsibility of the lead agency in requesting the WSA are committed to statute does not change the fundamental nature of the WSA itself as an advisory and informational document. This is true especially in view of the Legislative history of Senate Bill 610.

Senate Bill 610 was motivated by a concern that certain counties and cities were either ignoring or inadequately considering water supply issues prior to approving new developments. While the Legislature wanted to ensure that lead agencies thoroughly considered water supply issues and wanted to add transparency to the entire process, the Legislature committed the final determination on water supply issues to the lead agency, not the water providers. Indeed an earlier iteration of the WSA law that gave the water providers ultimate determination of whether insufficient water supplies constituted "significant environmental effects under CEQA" was rejected because opponents viewed it as shifting land use decisionmaking authority from the cities and counties to water suppliers.

 Furthermore, there is no indication that the Legislature intended to create an additional layer of judicial review or to provide an additional avenue for judicial intervention in the middle of the EIR process at the behest of any party other than the lead agency. Most telling in this respect is that on the same day the Legislature enacted Senate Bill 610, it also enacted Senate Bill 221 which provides nonagency third parties with an opportunity to seek judicial intervention under Government Code section 66473.7 to compel a water system to comply with the water verification law. That the Legislature omitted the right to third party judicial intervention from Senate Bill 610 is instructive as to how the WSA should be viewed in the larger context of the EIR process. The WSA is but an interlocutory and preliminary step in the EIR process, and in general, interim determinations are not subject to mandamus review. (*Jones v. Oxnard School Dist.* (1969) 270 Cal.App.2d 587, 590–592 [75 Cal.Rptr. 836] (*Jones*) [court rejected defendant's attempt to seek mandamus review of action of school board in filing a "statement of need for noncertificated teacher" with the state board of education because

school board's action was a preliminary step by one government agency (the school district) enabling another (the State Board of Education) to act].)

In the same way that the referee's decision was the final assessment as to the availability of unemployment benefits in *Du Four*, and that the filing of the statement of need was final as to the school board in *Jones*, the WSA approved by a water provider may in fact constitute the "final" opinion of the provider as to the sufficiency of the current water supply and/or final determination as to the provider's plans for acquiring or developing additional water supplies. Such finality, however, does not mean the WSA is "final" for the purposes of judicial intervention by way of mandamus review.

▪ Once the WSA is approved by the water provider's governing board the WSA is submitted to the lead agency. The lead agency may then evaluate the information included in the WSA. (Wat. Code, § 10911, subd. (c).) The power to "evaluate" the WSA necessarily invests the lead agency with the authority to consider, assess and examine the quality of the information in the WSA and endows the lead agency with the right to pass judgment upon the WSA. While the lead agency must include the WSA in the EIR, the lead agency is not required to accept the WSA's conclusions. The lead agency may in evaluating the WSA accept or disagree with the water provider's analysis or may request additional information from the water provider.[21] In any event, the lead agency is required by statute to make the ultimate determination, based on the entire record, whether water supplies are sufficient. (Wat. Code, § 10911, subd. (c).) The lead agency may make a finding that adequate water supplies exist (or do not exist) to meet the project's anticipated demand, even if that finding is inconsistent with the conclusions in the public water system's assessment.

▪ In short, because the adoption of a WSA does not create a right or entitlement to water service or impose, expand, or limit any duty concerning the obligation of a public water system to provide certain service and because the lead agency has a separate (from the water provider's WSA) and

---

[21] That a lead agency can effectively reject the conclusions reached in a WSA does not mean the lead agency should. Indeed the purpose behind the WSA law is to ensure that relevant information concerning water supplies is assessed and considered prior to the approval of statutorily defined projects. The water provider is one of the key sources of that information and the WSA is the effective method that information is transmitted to land use decision makers. Thus, to fulfill its usefulness and statutory aims, the lead agency would be well advised to evaluate the WSA and if the WSA is found to be incomplete or to contain inaccurate information or faulty analysis, the lead agency should request the water supplier to modify, correct or supplement the WSA.

independent obligation to assess the sufficiency of water supplies for the proposed project, we conclude the WSA is not a final agency decision, determination or action as that term is used in the context of mandamus relief. Under the WSA law framework, the "final" decision for the purposes of writ review occurs only after the lead agency acts—completes its obligations under the WSA and CEQA.

Our conclusion that the WSA is not final for the purposes of mandamus review until the lead agency makes the final determination on the sufficiency of water supplies, the CEQA review is complete and the project is approved by the City is fully consistent with the manner in which judicial challenges are asserted to assail the adequacy of environmental impact determinations in general. A judicial proceeding challenging compliance with CEQA and/or specifically attacking the adequacy of the EIR, including the conclusions and analysis contained in an environmental assessment prepared for the EIR is properly commenced *after* the lead agency certifies the EIR and approves the project. (See, e.g., *Santa Clarita Organization of Planning the Environment v. County of Los Angeles* (2007) 157 Cal.App.4th 149, 154, 158–159 [68 Cal.Rptr.3d 449] [after the lead agency approved the recertified EIR, an environmental group filed a petition for an administrative writ of mandate challenging the adequacy of the WSA contained in the EIR]; *Mission Oaks Ranch, Ltd. v. County of Santa Barbara* (1998) 65 Cal.App.4th 713, 722–723 [77 Cal.Rptr.2d 1] [running of statute of limitations to challenge adequacy of an EIR commences upon the filing of the lead agency's determination on the matter; thus judicial attack on the contents of an EIR found to be untimely where challenger waited too long after the agency's administrative decision to file its petition for writ of mandate], overruled on other grounds in *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1123, fn. 10 [81 Cal.Rptr.2d 471, 969 P.2d 564]; *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 965 [91 Cal.Rptr.2d 66] [CEQA challenges to project were not untimely where they were filed within statute of limitations period which commenced when the agency approved the project, agreeing to be legally bound to take a course of action]; *County of San Diego v. Grossmont-Cuyamaca Community College Dist.* (2006) 141 Cal.App.4th 86, 95 [45 Cal.Rptr.3d 674] [adequacy of college district's findings on traffic impacts and traffic mitigation measures contained in EIR properly challenged by way of writ of mandate filed after college district certified the EIR and approved the master plan for the project].)

Thus, the WSA was not "final" for mandamus purposes when C-WIN filed its petition.

## 2. *Exhaustion of Administrative Remedies*

Likewise C-WIN neglected to exhaust its available administrative remedies before seeking judicial intervention.

The doctrine of exhaustion of administrative remedies is a closely related concept to finality. The policy reasons behind the two doctrines are similar. The exhaustion doctrine precludes review of an intermediate or interlocutory action of an administrative agency. (*Alta Loma School Dist. v. San Bernardino County Com. on School Dist. Reorganization* (1981) 124 Cal.App.3d 542, 554 [177 Cal.Rptr. 506] (*Alta Loma*).) A party must proceed through the full administrative process "to a final decision on the merits." (*La Costa Beach Homeowners Assn. v. Wayne* (1979) 89 Cal.App.3d 327, 330 [152 Cal.Rptr. 355].) Each step in the administrative proceeding cannot be reviewed separately, any more than each ruling in the trial of a civil action may be separately reviewed by a separate appeal. Administrative proceedings should be completed before the issuance of a judicial writ. The rule is not a matter of discretion; compliance is a jurisdictional prerequisite to judicial review. (*Alta Loma, supra,* 124 Cal.App.3d at p. 554.) " 'Exhaustion' applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course." (*United States v. Western Pac. R. Co.* (1956) 352 U.S. 59, 63–64 [1 L.Ed.2d 126, 77 S.Ct. 161, 135 Ct.Cl. 997], superseded by regulation on other grounds in *Jones Truck Lines v. Aladdin Synergetics, Inc.* (M.D.Tenn.1994) 174 B.R. 76.) Moreover, the exhaustion doctrine applies even where the administrative remedy is couched in permissive language. (*County of Los Angeles v. Farmers Ins. Exchange* (1982) 132 Cal.App.3d 77, 85–87 [182 Cal.Rptr. 879] [although the Insurance Code did not expressly direct claimants to seek administrative remedies from the Insurance Commissioner prior to seeking judicial intervention, the broad statutory power afforded the Insurance Commissioner provided the authority to grant adequate remedies and thus claimants were not permitted to bypass the entire administrative process].)

The principal purposes of exhaustion requirements include avoidance of premature interruption of administrative processes, allowing an agency to develop the necessary factual background of the case, letting the agency apply its expertise and exercise its statutory discretion, and administrative efficiency and judicial economy. (*McKart v. United States* (1969) 395 U.S. 185, 193–194 [23 L.Ed.2d 194, 89 S.Ct. 1657].) The exhaustion doctrine is grounded on concerns favoring administrative autonomy (i.e., courts should not interfere with an agency determination until the agency has reached a final decision) and judicial efficiency (i.e., overworked courts should decline to intervene in an administrative dispute unless absolutely necessary).

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

(*Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 391 [6 Cal.Rptr.2d 487, 826 P.2d 730].)

■■■ This notwithstanding, exhaustion of administrative remedies is not required where it appears the administrative board is without jurisdiction and thus the remedy is unavailable or where the remedy is inadequate. (*Eight Unnamed Physicians v. Medical Executive Committee, supra*, 150 Cal.App.4th at p. 511.) In addition, exceptions to the exhaustion doctrine also exist where the administrative agency has made it clear it would be futile to pursue the administrative process to conclusion or where irreparable harm will result if judicial intervention is withheld until a final administrative decision is rendered. (*Alta Loma, supra*, 124 Cal.App.3d at p. 554.)

In this case the issue is whether C-WIN was required to submit its complaints about the WSA to the lead agency and wait until the lead agency acted prior to seeking judicial intervention. C-WIN maintains that it is not required to seek redress from the lead agency because the "City had no authority to disapprove, modify or set-aside the WSA" and thus C-WIN had no administrative remedy.

We disagree. As explained elsewhere herein, we interpret the City's statutory authority (derived from Wat. Code, § 10911) to evaluate the WSA and the concomitant duty to make the final determination on the sufficiency of water supplies as empowering the City to approve or disapprove the WSA or to request the Water District to revise, modify, amend or supplement the WSA.

The matter before this court is similar to that presented in *Alta Loma* where certain school districts brought a mandamus proceeding challenging a county's reorganization plan that would have caused the school districts to go out of existence. The school districts sought to prohibit the transmittal of the plan to the State Board of Education. The school districts claimed, among other arguments, that they were not required to exhaust administrative remedies before the State Board of Education because the board did not have jurisdiction to assess some of the claims and therefore there was no available administrative remedy. (*Alta Loma, supra*, 124 Cal.App.3d at p. 555.) The Court of Appeal disagreed, concluding the county was entitled to a demurrer because the school districts had failed to exhaust the administrative remedies. Specifically the school districts had failed to seek review from the State Board of Education of sufficiency of the proceedings before the county and of the reorganization plan: "Whether the alleged procedural defects in the county committee's proceedings occurred and, if so, whether the proposed reorganization plan should be disapproved are matters which come within the jurisdiction of the State Board and are decisions which should be made in the

first instance by the State Board." (*Id.* at p. 556.) As the *Alta Loma* court observed "[i]t lies within the power of the administrative agency to determine in the first instance and before judicial relief may be obtained whether a given controversy falls within its granted jurisdiction." (*Ibid.*) Like the State Board of Education, so too, the City in this case has the power to assess C-WIN's claims and provide the requested relief. As in *Alta Loma,* application of the exhaustion doctrine also affords the parties and the courts the benefit of the expertise and experience of the administrative agency. The court would have the benefit of the views of those having expertise in matters of local land use and water supply issues, including the analysis and recommendations of the City's decision makers.

Furthermore, C-WIN has not shown that this case comes within any of the other exceptions to the exhaustion doctrine. C-WIN has not shown that they will suffer irreparable injury if they are required to await final administrative action by the City or that pursuit of their grievances through the City would be an exercise in futility.

We also reject C-WIN's argument that absent direct and immediate judicial intervention, the adequacy of the WSA will evade all judicial review. As the circumstances in the *California Oak Foundation* case clearly demonstrate, water supply issues will not escape judicial scrutiny where judicial review occurs after the City's certification of the EIR and approval of the project. Division Eight's opinion discloses a critical review of the City and the Water District's WSA, which ultimately resulted in a court order requiring the City to reexamine water supply issues and a City request to the Water District to prepare a new WSA. C-WIN has not convinced us that proceeding in the same manner as *California Oak Foundation,* that is, asserting a challenge to the WSA as part of a challenge to the EIR *after* the City has certified the EIR and approved the project case, would result in unworkable or inadequate judicial review of the WSA.

Finally requiring C-WIN to (1) complete the administrative process prior to seeking judicial intervention and (2) assail the WSA as part of a challenge to the EIR conserves the parties' and the court's resources and avoids the possibility of multiple and simultaneous litigation as well as inconsistent rulings concerning the same project. In addition, as respondents point out, a direct challenge to a WSA in the middle of the EIR review proceedings could delay the review process and could preclude the lead agency from completing and certifying the EIR within the timeframes required under CEQA.

In view of all of the foregoing, we conclude the trial court did not err in granting the judgment on the pleadings and properly entered judgment.

## *DISPOSITION*

The judgment is affirmed. Respondents and real parties in interest are entitled to costs on appeal.

Perluss, P. J., and Zelon, J., concurred.