[No. A114809. First Dist., Div. Three. Nov. 19, 2008.]

O.W.L. FOUNDATION et al., Plaintiffs and Respondents, v.
CITY OF ROHNERT PARK et al., Defendants and Appellants;
UNIVERSITY DISTRICT LLC et al., Real Parties in Interest and
Appellants.

## COUNSEL

Michelle Marchetta Kenyon, City Attorney; McDonough Holland & Allen, Veronica Ramirez; Best Best & Krieger and Roderick E. Walston for Defendants and Appellants.

Kronick, Moskowitz, Tiedemann & Girard, Eric N. Robinson and Julia E. Blair for the League of California Cities and California Association of Counties as Amici Curiae on behalf of Defendants and Appellants.

Cox, Castle & Nicolson, Andrew B. Sabey and R. Chad Hales for Burbank Housing and the Non-Profit Housing Association of Northern California as Amici Curiae on behalf of Defendants and Appellants.

Downey Brand, Scott L. Shapiro, Jennifer L. Harder and Joseph S. Schofield for California Water Agencies as Amicus Curiae on behalf of Defendant and Appellant City of Rohnert Park.

Bingham McCutchen, Stephen L. Kostka, Geoffrey L. Robinson and Marie A. Cooper for Real Parties in Interest and Appellants.

Weston, Benshoof, Rochefort, Rubalcava & MacCuish, Edward J. Casey and Tammy L. Jones for Plaintiffs and Respondents.

## OPINION

**McGUINESS, P. J.**—Section 10910 of the Water Code[1] requires a public water system to prepare a water supply assessment (WSA) that analyzes whether water supplies are sufficient for certain proposed development projects. If the water supply for the proposed project includes groundwater, the statute requires the water supplier to analyze whether groundwater supplies will be sufficient to meet the projected demand associated with the project. (§ 10910, subd. (f)(5).)

At issue in this appeal is whether the groundwater sufficiency analysis contained in a WSA adopted by appellant City of Rohnert Park (City) satisfies the requirements of section 10910, subdivision (f). The trial court concluded the sufficiency analysis did not comply with the statute and consequently granted a writ of mandate requiring the City to set aside its resolution adopting the WSA.

Appellants contend the trial court erred by requiring that a water supplier assess water demands and projected pumping by all others taking water from the same groundwater basin. They urge that the statute contains no such requirement but instead allows water suppliers flexibility in determining how to measure groundwater sufficiency for a proposed project. Although respondents concede it is unrealistic to expect a water supplier to analyze actual pumping by all users in a large groundwater basin, they nonetheless argue that a study area selected by the water supplier to assess groundwater sufficiency must be representative of conditions in the basin. Respondents contend the City's relatively small study area is not representative of the relevant groundwater basin because its boundaries are defined by a watershed boundary that extends beyond the borders of the groundwater basin.

We agree with appellants that a WSA need not analyze groundwater pumping by all users in an entire basin. We also agree that the relevant statute does not specify a particular methodology for a sufficiency analysis and in that respect affords the water supplier substantial discretion in determining how to measure groundwater sufficiency. While that discretion is not boundless, we are satisfied the City acted well within its discretion in adopting the WSA. Accordingly, we reverse.

### FACTUAL AND PROCEDURAL BACKGROUND

#### City's General Plan and Water Supply Issues

State law requires that cities and counties prepare "general plans" that establish policies and standards for future development. (Gov. Code, § 65300

---

[1] All further statutory references are to the Water Code unless otherwise specified.

et seq.) By the late 1990's, the City was almost entirely built out as anticipated under its then applicable general plan, with only 190 acres of vacant land within City limits and no remaining residential sites.

In October 1999, the City prepared and released a draft of an amended general plan. A key component of that plan was to expand the City's limits and create a new urban growth boundary for future development. The amended general plan anticipated the approval of almost 4,500 new residential units, five million square feet of new commercial space, and the annexation of over 1,000 acres of land.

The City prepared an environmental impact report (EIR) associated with the amended general plan. The EIR included a discussion of water resources. The City has two main sources of water supply—surface water and groundwater—in addition to smaller amounts of recycled water. The City acquires its surface water supplies from the Sonoma County Water Agency, a water wholesaler that diverts water from the Russian River and provides water supplies to many communities in Sonoma County. The City acquires most of its groundwater supplies from its own wells, which are located within the City limits.

In order to assess the sufficiency of groundwater supplies for its general plan EIR, the City hired a consulting company called PES Environmental, Inc. (PES). PES performed its groundwater analysis using a computer model developed by the United States Geological Survey. Using the computer model, PES studied the "recharge rate," or the amount of rainwater that naturally flows back into the "model domain area," a study area that extended somewhat beyond the City limits. PES concluded that full implementation of the general plan would result in "substantial lowering of groundwater levels in the vicinity of the proposed Urban Growth Boundary."

Apparently acknowledging that production of groundwater had exceeded recharge during the period under study, the City in its general plan called for virtual elimination of groundwater pumping by 2010, with municipal wells to serve only as a backup and emergency supply at the time. The general plan assumed the City would receive 15 million gallons a day (mgd) of imported surface water by 2010, more than double the City's then existing allotment of imported surface water from the Sonoma County Water Agency.

In 2001, a lawsuit was filed against the City challenging the sufficiency of its general plan EIR. The lawsuit resulted in a stipulated judgment that prohibited the City from approving any development project outside its existing boundaries that would result in the City exceeding an average

groundwater pumping rate of 2.3 mgd, or 2,578 acre-feet per year (afy).[2] In the mid-1990's, the City had been pumping over 5,000 afy. However, by 2004 its pumping had been reduced to approximately 1,520 afy.

## Water Supply Assessment

■ Section 10910 et seq. requires public water agencies to prepare a WSA to assess the sufficiency of water supplies for certain proposed development projects, in order to assist local governments in deciding whether to approve the projects. (See §§ 10910–10915.) The WSA must describe whether the public water agency's "total projected water supplies available during normal, single dry, and multiple dry water years" for a 20-year period will meet the "projected water demand [for] the proposed project," taking into account the agency's "existing and planned future uses, including agricultural and manufacturing uses." (§ 10910, subd. (c)(3).) If the water supplies will be provided by a local government—i.e., a city or county—the local government must prepare the WSA. (§ 10910, subd. (b).) The local government must include the WSA in the EIR and consider it when deciding whether to approve the project. (§ 10911, subd. (b).)

■ When the water supply for a proposed project includes groundwater, the WSA must discuss and analyze specific information pertaining to groundwater sources and supply. (§ 10910, subd. (f).) The specific requirements are set forth in section 10910, subdivision (f).[3] In particular, a WSA that relies in

---

[2] One acre-foot of water is enough water to cover an acre to a depth of one foot, equivalent to 325,851 gallons. Thus, one mgd corresponds to roughly 1,120 afy.

[3] Subdivision (f) of section 10910 provides in full as follows: "(f) If a water supply for a proposed project includes groundwater, the following additional information shall be included in the water supply assessment: [¶] (1) A review of any information contained in the urban water management plan relevant to the identified water supply for the proposed project. [¶] (2) A description of any groundwater basin or basins from which the proposed project will be supplied. For those basins for which a court or the board has adjudicated the rights to pump groundwater, a copy of the order or decree adopted by the court or the board and a description of the amount of groundwater the public water system, or the city or county if either is required to comply with this part pursuant to subdivision (b), has the legal right to pump under the order or decree. For basins that have not been adjudicated, information as to whether the department has identified the basin or basins as overdrafted or has projected that the basin will become overdrafted if present management conditions continue, in the most current bulletin of the department that characterizes the condition of the groundwater basin, and a detailed description by the public water system, or the city or county if either is required to comply with this part pursuant to subdivision (b), of the efforts being undertaken in the basin or basins to eliminate the long-term overdraft condition. [¶] (3) A detailed description and analysis of the amount and location of groundwater pumped by the public water system, or the city or county if either is required to comply with this part pursuant to subdivision (b), for the past five years from any groundwater basin from which the proposed project will be supplied. The description and analysis shall be based on information that is reasonably available, including, but not limited to, historic use records. [¶] (4) A detailed description and analysis of the amount and

part on groundwater as a source is required to (1) consider information in any urban water management plan relevant to supplies for the project (§ 10910, subd. (f)(1)); (2) describe the groundwater basin that will supply the project (§ 10910, subd. (f)(2)); (3) describe and analyze *past* groundwater pumping by the water supplier from the basin that will supply the project, based on reasonably available information (§ 10910, subd. (f)(3)); (4) describe and analyze *projected* future pumping by the water supplier from the basin, again based on reasonably available information (§ 10910, subd. (f)(4)); and (5) conduct an analysis of the sufficiency of the groundwater from the basin or basins from which the proposed project will be supplied to meet the demands of the proposed project (§ 10910, subd. (f)(5)).

By 2004, the City was processing the approvals for six development projects contemplated in its general plan. Among the projects was the University District Specific Plan Area (SPA), which consists of approximately 300 acres. The application for the University District SPA project requested 1,610 residential units and approximately 250,000 square feet of commercial uses, with the potential for a total of 350,000 square feet of commercial space. The University District SPA is proposed to be developed by appellants University District LLC and Vast Oak Properties, L.P.

Because it planned to provide water supplies for the proposed projects in the areas of planned expansion, the City was charged with preparing the WSA required by section 10910 et seq. And, because water supplies for the proposed projects include groundwater, the WSA was required to analyze the specific factors itemized in subdivision (f) of section 10910.

Following issuance of a tentative WSA and after allowing for public comment, the city council adopted a resolution approving the final WSA on January 23, 2005. The WSA concluded that groundwater supplies available during normal, single-dry, and multiple-dry years within a 20-year timeframe would meet the projected demand associated with the proposed new projects, in addition to existing and other planned groundwater uses within a defined study area. The defined study area was smaller than the groundwater subbasin

location of groundwater that is projected to be pumped by the public water system, or the city or county if either is required to comply with this part pursuant to subdivision (b), from any basin from which the proposed project will be supplied. The description and analysis shall be based on information that is reasonably available, including, but not limited to, historic use records. [¶] (5) An analysis of the sufficiency of the groundwater from the basin or basins from which the proposed project will be supplied to meet the projected water demand associated with the proposed project. [¶] A water supply assessment shall not be required to include the information required by this paragraph if the public water system determines, as part of the review required by paragraph (1), that the sufficiency of groundwater necessary to meet the initial and projected water demand associated with the project was addressed in the description and analysis required by paragraph (4) of subdivision (b) of Section 10631."

that would supply the proposed projects and extended beyond the boundary of the relevant groundwater basin in certain areas. As reflected in the WSA, the study area was chosen at least in part to correspond to the boundary of the watershed for the Laguna de Santa Rosa, a swampy intermittent stream.

The WSA's analysis of groundwater levels was not limited to the study area but instead assessed data from 138 wells throughout the relevant groundwater subbasin. The WSA reported that groundwater elevations near City wells "were generally stable from 1977 to 1981, declined from 1982 to 1990 as pumpage increased, and gradually increased from 1990 to 1997 when pumpage for the study area averaged about 8,700 AFY." The WSA noted that "[g]roundwater levels were stable from 1997 to 2003 and exhibited a marked recovery when total pumpage decreased to about 7,100 AFY in 2003." The WSA concluded that water level declines during 1982 to 1990 were not indicative of an overdraft condition, and further reported there was "no indication of generally declining groundwater levels elsewhere in the subbasin in any zone . . . ."

In its assessment of groundwater sufficiency to support the proposed projects, the WSA reviewed historical groundwater levels, historical pumpage, historical precipitation, groundwater quality, geological information, published and unpublished reports and maps, and projected water demands for the City and other pumpers within the study area. Pumping data for the City dated back to 1970, well beyond the five years of pumping data required by statute. (§ 10910, subd. (f)(3).) In addition, the WSA estimated historical pumping for the same period for other entities within the study area, such as the City of Cotati and Sonoma State University, as well as for private domestic, commercial, and agricultural pumpers. The WSA projected pumping through the year 2025 for the City and all other users within the study area. The WSA assumed City pumping in 2025 would not exceed 2,577 afy, consistent with a 2004 City resolution and a stipulation that resulted from settlement of a lawsuit over the City's general plan EIR. The projected total pumping for the year 2025 in the study area was estimated to be 7,350 afy, a slight increase from current pumping but a notable decrease from historical pumping levels. The WSA concluded the projected 2025 pumping "falls within the range of historically sustainable pumpage."

### Trial Court Proceedings

O.W.L. Foundation[4] and three individual residents of Sonoma County (collectively, OWL) filed suit against the City and the city council challenging the WSA and seeking a writ of mandate vacating the WSA. Respondents

---

[4] OWL is an acronym for "open space," "water resource protection," and "land use." OWL is a nonprofit corporation with the mission of securing the adoption of a program to ensure sustainable management of water resources in Sonoma County.

also sought declaratory relief concerning the WSA's validity. The proposed developers of the University District SPA, appellants University District LLC and Vast Oak Properties, L.P., were granted leave to intervene in the action.

At a hearing on April 11, 2006, the trial court issued a tentative ruling granting the writ of mandate and concluding that the City's WSA was legally inadequate. The thrust of the court's tentative ruling was twofold. First, because the City did not prove the study area was "sufficient to make a determination about the entire groundwater basin, or at least the relevant subbasin," according to the court, the City did not comply with section 10910, subdivision (f)(5), which requires an analysis of the sufficiency of the groundwater from the basin or basins from which the project will be supplied. Second, the court tentatively held that the City did not comply with subdivision (f)(2) of section 10910, because the City assessed whether the groundwater basin was in "overdraft" by employing a definition of that term different from the one used by California's Department of Water Resources (DWR).

The court requested that the parties file supplemental briefs on the very issue now before this court—"whether or not the study area, the WSA study area, is a sufficient sample for making a determination about the entire groundwater basin, or at least the relevant subbasin." No further briefing was requested on whether the City's discussion of overdraft was consistent with the DWR's use of that term.

A further hearing was held on May 31, 2006. The court confirmed its tentative ruling with respect to whether the WSA complied with section 10910, subdivision (f), which requires a groundwater sufficiency analysis. The court did not reach the question of whether the City had properly addressed the issue of overdraft in the WSA.

The court articulated its concern that the study area chosen by the City's consultants was not entirely in the relevant groundwater subbasin but was instead partly in another groundwater basin and partly in an area that was not part of a groundwater basin at all. The court noted that appellants "appear[ed] to be saying that the study area was not a sample used to determine anything about the entire [groundwater] basin or subbasin [and] . . . only used the study area to determine the pumpage, or the area from which the projected project will pump." In its supplemental trial court brief, the City took the position the study area was utilized only to calculate historical and future pumping for purposes of assessing whether water from the groundwater basin would be sufficient to support that future pumping. The City expressly disclaimed that the study area was supposed to be a representative sample of the relevant groundwater subbasin. The court stated that section 10910,

subdivision (f)(5) "appears to require a real analysis of the amount of water available, which seems to require a determination of the amount of water being used and expected to be used by everyone who uses the same water supply." The court observed that "[i]t's not clear how anyone can tell if the amount of water is sufficient for proposed projects if it is unknown how much is being consumed by existing users or projects that have already been approved."

The court entered judgment granting OWL's request for a peremptory writ of mandate and for declaratory relief. The court issued a judicial declaration consisting of its conclusions made at the hearings conducted on April 11 and May 31, 2006. The writ of mandate directed the City to vacate its resolution adopting the WSA.

The City and city council, as well as interveners and real parties in interest University District LLC and Vast Oak Properties, L.P. (collectively, appellants), timely filed notices of appeal from the judgment.

### DISCUSSION

The focus of this appeal, and of OWL's objection to the City's WSA, is on whether the WSA properly complied with subdivision (f)(5) of section 10910 (hereafter section 10910(f)(5)), which provides in relevant part that a WSA shall include "[a]n analysis of the sufficiency of the groundwater from the basin or basins from which the proposed project will be supplied to meet the projected water demand associated with the proposed project." The parties and the court below have offered differing interpretations of what exactly is required by section 10910(f)(5).

Before we address the requirements of section 10910(f)(5), however, we must address a preliminary concern that arose after this matter was fully briefed. In particular, in *California Water Impact Network v. Newhall County Water Dist.* (2008) 161 Cal.App.4th 1464, 1471 [75 Cal.Rptr.3d 393] (*C-WIN*), Division Seven of the Court of Appeal for the Second Appellate District held that the adequacy of a WSA is not subject to judicial review except when contested as part of a challenge to an EIR after project approval. In this case, OWL challenged the adequacy of the WSA before adoption of an EIR and before completion of the review process required by the California Environmental Quality Act, Public Resources Code section 21000 et seq. (CEQA). A strict application of *C-WIN*'s holding might suggest this matter is not properly subject to judicial review. The parties provided supplemental briefing addressing *C-WIN* and its implications for this case.

We first address below whether this matter is properly subject to judicial review in light of *C-WIN*. We then turn to the substantive questions raised by this appeal concerning the requirements of section 10910(f)(5).

I. *Judicial Review of WSA's*

 A. *Facts and Analysis in* C-WIN

The dispute giving rise to the decision in *C-WIN* began when a developer proposed building an industrial and business park in the City of Santa Clarita. As mandated by CEQA, the City of Santa Clarita was required to prepare and certify an EIR before it could approve the project. At the request of the City of Santa Clarita, the local water district prepared a WSA, which was included in the EIR. The City of Santa Clarita certified the EIR and approved the project. (*C-WIN, supra*, 161 Cal.App.4th at pp. 1471–1472.) A number of entities sued to set aside the certification of the final EIR, claiming it "overstated and misstated the extent of reliable sources of water." (*Id.* at p. 1473.) On appeal, the court agreed that the section of the EIR discussing water supplies was inadequate and consequently ordered the EIR to be decertified. Following issuance of the Court of Appeal decision, the City of Santa Clarita directed the water district to prepare a new WSA. (*Ibid.*) After the water district adopted the new WSA, the California Water Impact Network (C-WIN) filed a petition seeking a writ of mandate, alleging the WSA was legally deficient. (*Id.* at pp. 1473–1474.) The trial court dismissed the petition, concluding that while " 'WSA's are not immune from judicial review, [they] must be challenged and reviewed as part of CEQA review.' " (*Id.* at p. 1475.)

■ The Court of Appeal affirmed the order dismissing the petition, holding that "the adequacy of a WSA is properly challenged as part of a challenge to an EIR after project approval." (*C-WIN, supra*, 161 Cal.App.4th at p. 1471.) The court concluded that until the City of Santa Clarita "certified the EIR and approved the project, the adequacy of the WSA was not subject to judicial challenge." (*Ibid.*)

■ The *C-WIN* court rested its determination on a WSA's lack of finality and the failure of C-WIN to exhaust its administrative remedies before the City of Santa Clarita. (*C-WIN, supra*, 161 Cal.App.4th at pp. 1484–1485.) The court noted that "[u]ntil a public agency makes a 'final' decision, the matter is not ripe for judicial review. [Citation.]" (*Id.* at p. 1485.) In the *C-WIN* court's view, a WSA is "a technical, informational, advisory opinion of the water provider" required to be included in the EIR, and is akin to "other informational opinions provided by other entities concerning potential environmental impacts—such as traffic, population density or air quality." (*Id.* at p. 1486.) The court stated "there is no indication that the Legislature intended to create an additional layer of judicial review or to provide an additional avenue for judicial intervention in the middle of the EIR process . . . ." (*Ibid.*)

The court in *C-WIN* explained that "[t]he doctrine of exhaustion of administrative remedies is a closely related concept to finality." (*C-WIN, supra*, 161 Cal.App.4th at p. 1489.) "The principal purposes of exhaustion requirements include avoidance of premature interruption of administrative processes; allowing an agency to develop the necessary factual background of the case; letting the agency apply its expertise and exercise its statutory discretion; and administrative efficiency and judicial economy. [Citation.]" (*Ibid.*) The court rejected the contention that C-WIN had no administrative remedy before the City of Santa Clarita, explaining that the lead agency (i.e., the city) retained the power to evaluate the WSA, "to approve or disapprove the WSA or to request the Water District to revise, modify, amend or supplement the WSA." (*Id.* at p. 1490.)

The court also rejected the contention that a WSA will escape judicial scrutiny if review only takes place after certification of an EIR and approval of a project. (*C-WIN, supra*, 161 Cal.App.4th at p. 1491.) It explained a party can assert a challenge to a WSA as part of a challenge to an EIR, just as had been done in the earlier proceeding that was successful in decertifying the EIR and requiring the preparation of a new WSA. (*Ibid.*) Finally, the appellate court turned to considerations of judicial efficiency, pointing out that requiring C-WIN to complete the administrative process and wait until an EIR is approved "avoids the possibility of multiple and simultaneous litigation as well as . . . inconsistent rulings concerning the same project." (*Ibid.*)

### B. *Application of* C-WIN *to This Case*

■ Following issuance of the opinion in *C-WIN*, this court requested that the parties provide supplemental briefing addressing *C-WIN* and its application to this case. Among other things, we asked the parties to address whether, in light of the holding in *C-WIN*, this court lacks subject matter jurisdiction to consider a challenge to a WSA before certification of an EIR and approval of a project. If this court lacks fundamental jurisdiction over the subject matter, then we lack power to hear or determine the case, and any judgment rendered would be void on its face. (See *Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 196, 198 [25 Cal.Rptr.3d 298, 106 P.3d 958].)

All of the parties to this appeal take the position that the sufficiency of the WSA in this case is properly the subject of judicial review. Under the unique set of circumstances presented by this case, we agree.

Several critical facts distinguish this case from *C-WIN*. As reflected in the parties' supplemental submissions to this court, before the trial court issued

the ruling on appeal here, the City certified the EIR for the University District SPA project, which incorporated the WSA. OWL filed a lawsuit challenging the City's adoption of the University District SPA (the CEQA lawsuit). According to the parties, the claims in the CEQA lawsuit are the same as the claims in this action, namely, whether the WSA is legally sufficient. Indeed, the parties to the CEQA lawsuit entered into a stipulation staying that lawsuit and agreeing that the outcome of this action would dictate the result in the CEQA lawsuit. Thus, if the final decision in this action upholds the validity of the WSA, the parties agree to immediate entry of judgment in the CEQA lawsuit in favor of the City and the developer. Conversely, if the WSA is determined to be invalid in this action, the parties agree to immediate entry of judgment in the CEQA lawsuit in favor of OWL.

In light of these facts, it is incorrect to say that OWL has failed to exhaust its remedies before the lead agency with respect to the adequacy of the WSA. It is also incorrect to say that the WSA is not now final. If we were to conclude that a challenge to the WSA should be addressed in the CEQA lawsuit, we would complicate rather than simplify the litigation, requiring the parties to duplicate efforts already taken in this action in the CEQA lawsuit. Such a result would merely delay resolving the very issue that is now before this court. In short, the concerns about finality and exhaustion of remedies in *C-WIN* are not present here, and it would be enormously inefficient, both from the perspective of the parties and the courts, to delay resolution of this dispute until after it is litigated anew in the CEQA lawsuit.

Notwithstanding obvious concerns about efficiency and practicality, the question remains whether we lack fundamental subject matter jurisdiction in light of the procedural posture of the EIR process at the time this action was filed. In other words, because the EIR had not yet been certified at the time OWL filed the action below do we lack jurisdiction over the subject matter of this dispute such that we are compelled to dismiss the action? We conclude that any lack of finality or failure to exhaust administrative remedies does not deprive this court of fundamental jurisdiction over the parties and subject matter of this dispute.

■ The exhaustion requirement does not implicate subject matter jurisdiction in its fundamental sense. "Although earlier cases tended to view the exhaustion doctrine as invaliding a court's subject matter jurisdiction, thus allowing a defendant to raise it at any time [citations], later cases have generally [concluded] a defendant waives the defense by failing to timely assert it. [Citations.]" (*Mokler v. County of Orange* (2007) 157 Cal.App.4th 121, 135 [68 Cal.Rptr.3d 568].) Thus, "[t]he exhaustion of an administrative remedy is a *procedural prerequisite* to an action at law, and the failure to exhaust it does not divest a trial court of *subject matter jurisdiction.*

[Citations.]" (*Holland v. Union Pacific Railroad Co.* (2007) 154 Cal.App.4th 940, 946 [65 Cal.Rptr.3d 145].) Indeed, the exhaustion doctrine is subject to numerous equitable exceptions, confirming that failure to exhaust administrative remedies does not deprive a court of fundamental jurisdiction to act. (Cf. *Green v. City of Oceanside* (1987) 194 Cal.App.3d 212, 222 [239 Cal.Rptr. 470] [listing various equitable exceptions to exhaustion requirement].)

■ Likewise, the lack of a final decision by the City to certify an EIR and approve a project does not deprive this court of fundamental jurisdiction over the subject matter of the dispute. The finality requirement is an outgrowth of the "ripeness" requirement. (See *Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 169–171 [188 Cal.Rptr. 104, 655 P.2d 306].) "The ripeness requirement, a branch of the doctrine of justiciability, prevents courts from issuing purely advisory opinions. [Citation.] It is rooted in the fundamental concept that the proper role of the judiciary does not extend to the resolution of abstract differences of legal opinion. It is in part designed to regulate the workload of courts by preventing judicial consideration of lawsuits that seek only to obtain general guidance, rather than to resolve specific legal disputes. However, the ripeness doctrine is primarily bottomed on the recognition that judicial decisionmaking is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy. On the other hand, the requirement should not prevent courts from resolving concrete disputes if the consequence of a deferred decision will be lingering uncertainty in the law, especially when there is widespread public interest in the answer to a particular legal question. [Citations.]" (*Id.* at p. 170.) Here, the dispute is ripe for review because " 'the facts have sufficiently congealed to permit an intelligent and useful decision to be made.' [Citation.]" (*Environmental Defense Project of Sierra County v. County of Sierra* (2008) 158 Cal.App.4th 877, 885 [70 Cal.Rptr.3d 474].)

Therefore, we conclude that OWL's failure to exhaust administrative remedies and to secure a final decision on the EIR at the time it filed the action below does not preclude our review of the matter. We wish to emphasize, however, that our conclusion in this regard is limited to the unique facts of this case. As a general matter, we agree with *C-WIN* that the adequacy of a WSA is not subject to judicial challenge until after a lead agency has certified an EIR and approved a project. What makes this case unusual is that, by the

time we were called upon to consider the matter, the City had certified an EIR, which is being challenged by OWL in another lawsuit on the same grounds advanced here.[5]

## II. *Standard of Review*

This appeal is from a judgment granting a traditional writ of mandamus under Code of Civil Procedure section 1085. A party seeking review of a public agency decision may bring an administrative mandamus action under Code of Civil Procedure section 1094.5 if the agency decision was " 'made as a result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency . . . .' " (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 566 [38 Cal.Rptr.2d 139, 888 P.2d 1268].) "On the other hand, an administrative decision that does not require a hearing or a response to public input is generally not reviewable under Code of Civil Procedure section 1094.5 but by traditional mandamus pursuant to Code of Civil Procedure section 1085 . . . ." (*Environmental Protection & Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 521 [80 Cal.Rptr.3d 28, 187 P.3d 888].) Here, although the City chose to hold a public hearing, no hearing was required to be held as a matter of law. Therefore, the case was properly pursued as a traditional mandamus action.

In traditional mandamus actions, the agency's action must be upheld upon review unless it constitutes an abuse of discretion. (*Shapell Industries, Inc. v. Governing Board* (1991) 1 Cal.App.4th 218, 230 [1 Cal.Rptr.2d 818].) "When reviewing the exercise of discretion, '[t]he scope of review is limited, out of

---

[5] The parties seek to draw a number of additional differences between this case and *C-WIN* that purportedly render the holding in that case inapplicable here. They argue that, unlike in *C-WIN*, the water supplier and the lead agency are one and the same entity—the City. Thus, they contend the WSA is final for purposes of judicial review because the City has necessarily considered and approved the WSA. OWL claims another critical distinction is that the WSA covers multiple projects, unlike the single project contemplated in *C-WIN*. OWL argues it would be inefficient to require affected individuals to file separate CEQA lawsuits against each proposed development project. Finally, the parties assert that the court has jurisdiction to consider a declaratory relief claim concerning the legal sufficiency of the WSA irrespective of whether there is a right to challenge the WSA by traditional or administrative mandamus.

We clarify that the narrow exception to the holding in *C-WIN* permitting review of the WSA here does not turn on the distinctions urged by the parties. An interlocutory action of an administrative agency is not rendered any more appropriate for judicial review simply because a party seeks declaratory relief instead of a writ of mandamus. Further, even when a WSA encompasses multiple projects or is adopted by the lead agency as opposed to a separate water supplier, it remains an informational document that is but an interlocutory and preliminary step in the EIR process. The concerns articulated in *C-WIN* still exist even under those circumstances. Above all, there is no indication the Legislature intended to create an additional layer of judicial review in the middle of the EIR process for parties that may seek to challenge a WSA. (*C-WIN, supra*, 161 Cal.App.4th at p. 1486.)

deference to the agency's authority and presumed expertise: "The court may not reweigh the evidence or substitute its judgment for that of the agency. [Citation.]" ' [Citation.] 'In general . . . the inquiry is limited to whether the decision was arbitrary, capricious, or entirely lacking in evidentiary support . . . .' [Citation.] When making that inquiry, the ' " 'court must ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute.' [Citation.]" ' [Citation.]" (*American Board of Cosmetic Surgery v. Medical Board of California* (2008) 162 Cal.App.4th 534, 547–548 [75 Cal.Rptr.3d 574], fn. omitted (*American Board*).)

"[B]ecause 'trial and appellate courts perform the same function in mandamus actions, an appellate court reviews the agency's action de novo.' [Citation.]" (*Environmental Charter High School v. Centinela Valley Union High School Dist.* (2004) 122 Cal.App.4th 139, 145 [18 Cal.Rptr.3d 417].)

OWL mistakenly asserts that a substantial evidence standard of review applies, citing authority addressing administrative mandamus actions. (See *San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 673–675 [125 Cal.Rptr.2d 745]; *Intercommunity Medical Center v. Belshé* (1995) 32 Cal.App.4th 1708, 1710–1711 [39 Cal.Rptr.2d 43].) In contrast to the standard of review in a traditional mandamus action such as this one, in an administrative mandamus action the reviewing court inquires whether the administrative decision is supported by substantial evidence. (*American Board, supra*, 162 Cal.App.4th at p. 548, fn. 16.) In addition, a substantial evidence standard of review applies in a traditional mandamus action challenging a public agency decision for failure to comply with CEQA. (*Western States Petroleum Assn. v. Superior Court, supra*, 9 Cal.4th at p. 568; Pub. Resources Code, § 21168.5.) This is not an administrative mandamus action, and we are not asked to decide whether the WSA complies with the requirements of CEQA. Rather, our task is to determine whether the WSA complies with section 10910 et seq. of the Water Code.[6]

III. *Groundwater Sufficiency Analysis Required Under Section 10910(f)(5)*

In their opening briefs, appellants characterize the substantive question presented on appeal as whether section 10910(f)(5) requires water suppliers to analyze groundwater pumping by all users in an entire groundwater basin.

---

[6] Although we conclude that a deferential abuse of discretion standard applies to our review of the WSA, we note that the disposition of this matter would be no different were we to apply a substantial evidence standard of review. For reasons described in section III.E. of this opinion, *post*, there is substantial evidence to support the adoption of the WSA.

While that issue is certainly before this court, the broader question presented is how much discretion section 10910(f)(5) affords to a water supplier in analyzing groundwater sufficiency. In order to put this issue in context, we first discuss basic groundwater concepts and then the characteristics of the groundwater basin at issue.

### A. *Basic Groundwater Concepts*

A groundwater basin can in theory serve the same function as a surface reservoir in that it acts as a natural receptacle for storing water. A groundwater basin is defined as an "alluvial aquifer or a stacked series of alluvial aquifers with reasonably well-defined boundaries in a lateral direction and a definable bottom." (DWR, California's Groundwater: Bulletin 118-Update 2003 (Oct. 2003) at p. 88 (hereafter Bulletin 118).)[7] An aquifer is defined as a "body of rock or sediment that yields significant amounts of groundwater to wells or springs." (*Id.* at p. 85.) "[C]oarse materials such as sand and gravel deposits usually provide the best source of water and are termed aquifers; whereas the finer-grained clay and silt deposits are relatively poor sources of water and are referred to as aquitards." (*Id.* at p. 80.) A basin's "[l]ateral boundaries are features that significantly impede groundwater flow such as rock or sediments with very low permeability or a geologic structure such as a fault." (*Id.* at p. 88.)

Groundwater basins are defined by DWR on the basis of geological and hydrological conditions as well as consideration of political boundary lines where practical. (See § 12924, subd. (a).) Boundaries are based on the best information available to DWR and are subject to revision as more information is collected and evaluated. (Bulletin 118, *supra*, at p. 89.) "A [groundwater] subbasin is created by dividing a groundwater basin into smaller units using geologic and hydrologic barriers or, more commonly, institutional boundaries . . . ." (*Id.* at p. 90.) Subbasins are drawn for the purpose of managing water resources as well as collecting and analyzing data, among other things. The designation of a subbasin boundary is flexible and can change over time. (*Ibid.*)

A groundwater basin is in "overdraft" when "the amount of water withdrawn by pumping exceeds the amount of water that recharges the basin over a period of years, during which the water supply conditions approximate average conditions." (Bulletin 118, *supra*, at p. 96.) "Overdraft can be characterized by groundwater levels that decline over a period of years and never fully recover, even in wet years." (*Ibid.*)

Unlike surface water use, groundwater use has never been regulated by the state. (Bulletin 118, *supra*, at p. 32.) There are three basic methods for

---

[7] Bulletin 118 presents the results of DWR's groundwater basin evaluations in California and is updated from time to time.

managing groundwater resources in California. (*Id.* at p. 33.) First, the Legislature has enacted legislation authorizing local governments to voluntarily manage groundwater supplies, including authorizing the adoption of a "groundwater management plan." (See § 10750 et seq.) The goal of a groundwater management plan is to maintain and maximize long-term reliability of groundwater resources by preventing significant depletion of groundwater degradation of groundwater quality over the long term. (Bulletin 118, *supra,* at p. 44.) Second, local governments may adopt groundwater ordinances to regulate use. (*Id.* at p. 36.) Third, the courts may adjudicate the rights of groundwater users in a basin, in which case a judicial decree provides for management of a specific groundwater basin. (*Id.* at p. 40.) The process is lengthy and costly, with the longest adjudication having taken 24 years to complete. (See *id.* at pp. 42–43.)

### B. *Description of the Santa Rosa Valley Groundwater Basin*

Seven groundwater basins are found in Sonoma County. The City pumps groundwater from the Santa Rosa Valley Groundwater Basin. Three subbasins are found within this basin, including the Santa Rosa Plain Subbasin, the Healdsburg Subbasin, and the Rincon Valley Subbasin. The City is located within the Santa Rosa Plain Subbasin, which is bounded on the east by the Sonoma Mountains and on the west by hills of the Mendocino Range. Surface water enters the Santa Rosa Plain Subbasin through streams originating in the highlands east and west of the Santa Rosa Plain Subbasin, with streams being discharged into the Laguna de Santa Rosa, a swampy intermittent stream that flows northward along the western edge of the subbasin.

As of 1982, DWR found that the Santa Rosa Plain Subbasin was "about in balance, with increased ground water levels in the northeast contrasting with decreased ground water levels in the south." Although DWR observed rising groundwater levels near Santa Rosa and declining groundwater levels in the southern Santa Rosa Plain, DWR stated that "[t]hese differences tend to counter each other so that the basin, when viewed as a whole, can be considered essentially in balance." The parties acknowledge that the DWR had not updated its findings about basin-wide conditions since 1982.

### C. *Basin-wide Pumping Data*

Appellants contend that section 10910(f)(5) does not require water suppliers to conduct an analysis of pumping by all users in the groundwater basin. They assert the trial court in effect mandated such an analysis by interpreting section 10910(f)(5) to require a "real analysis of the amount of water

available," including "a determination of the amount of water being used and expected to be used by everyone who uses the same water supply."[8]

■ "Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy. [Citations.]" (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737 [21 Cal.Rptr.3d 676, 101 P.3d 563].) "If the meaning of the statute remains unclear after examination of both the statute's plain language and its legislative history, then we proceed cautiously to . . . apply 'reason, practicality, and common sense to the language at hand.' [Citation.]" (*Ailanto Properties, Inc. v. City of Half Moon Bay* (2006) 142 Cal.App.4th 572, 583 [48 Cal.Rptr.3d 340].) With the consequences that will flow from our interpretation in mind, we must give the words of the statute a workable and reasonable interpretation. (*Ibid.*)

■ Section 10910(f)(5) provides in relevant part that, when the water supply for a proposed project includes groundwater, the WSA must include "[a]n analysis of the sufficiency of the groundwater from the basin or basins from which the proposed project will be supplied to meet the projected water demand associated with the proposed project." Nothing in the plain language of section 10910(f)(5) refers to or requires a basin-wide study of past and future pumping by all users. The trial court appeared to assume that an analysis of "sufficiency" of groundwater necessarily required looking at pumping throughout a basin. However, there is nothing intrinsic in the word "sufficiency" that dictates preparation of a basin-wide study of existing and future pumping.

■ The only language in subdivision (f) of section 10910 that refers to pumping is found in subdivision (f)(3) and (4), which require the water supplier to provide a description and analysis of *its own* pumping "for the past five years" as well as projected pumping "based on information that is

---

[8] For its part, OWL argues the trial court did not mandate an analysis of basin-wide pumping but merely required the City to select a study area that would be representative of the groundwater basin or the relevant subbasin. Still, OWL suggests a basin-wide pumping analysis is the preferable approach and should be pursued when data is reasonably available and the basin is not so large as to make the endeavor too time consuming.

reasonably available." Under the maxim of *expressio unius est exclusio alterius,* "[t]he expression of some things in a statute necessarily means the exclusion of other things not expressed. [Citation.]" (*Gikas v. Zolin* (1993) 6 Cal.4th 841, 852 [25 Cal.Rptr.2d 500, 863 P.2d 745].) The inclusion of a specific requirement that a water supplier estimate its own past and projected pumping necessarily suggests the Legislature did not intend to require an estimate of the past and projected pumping for all users in the groundwater basin.

Furthermore, if the sufficiency analysis mandated by section 10910(f)(5) were construed as requiring data on groundwater pumping by all users in the basin, then the provisions of the statute requiring the water supplier to estimate its own past and projected pumping would be superfluous, because a WSA would necessarily have to include an analysis of pumping by the water supplier in order to estimate basin-wide pumping. Such a result violates the rule of construction that a statute is to be interpreted to avoid rendering terms meaningless or superfluous. (*Guillen v. Schwarzenegger* (2007) 147 Cal.App.4th 929, 946 [55 Cal.Rptr.3d 87].)

Applying this same principle of statutory construction, OWL argues section 10910(f)(5) would be rendered superfluous if it were interpreted as appellants propose. OWL contends that section 10910(f)(5) serves no purpose if the sufficiency analysis consists solely of a study of the water supplier's pumping, because that analysis is already required by subdivisions (f)(3) and (f)(4). We disagree. Plainly, section 10910(f)(5) requires more than just a simple reiteration of the water supplier's past and projected pumping. The sufficiency analysis requires some consideration of conditions in the relevant groundwater basin in connection with determining whether there is sufficient water to supply the proposed project. But there is nothing in the statute to suggest that the only way groundwater conditions may be analyzed is by measuring pumping by all users throughout a groundwater basin.

The legislative history supports the conclusion that a WSA is not required to analyze pumping throughout a groundwater basin. In fact, the Legislature expressly considered and rejected language that would have required such information. In its original draft form, Senate Bill No. 610 the legislation that added section 10910(f)(5), effective January 1, 2002, required "[a]n identification and description of the other users of the ground-water basin and the historical water use patterns of those other users during normal, single-dry, and multiple-dry water years." (Sen. Bill No. 610 (2001–2002 Reg. Sess.) as introduced Feb. 22, 2001, § 4(f)(1), italics omitted.) This language was stricken from the bill ultimately approved by the Legislature. "As a general principle, the Legislature's rejection of specific language constitutes persuasive evidence a statute should not be interpreted

to include the omitted language. [Citation.]" (*Doe v. Saenz* (2006) 140 Cal.App.4th 960, 985 [45 Cal.Rptr.3d 126].) Interpreting section 10910(f)(5) to require an analysis of basin-wide pumping contravenes this principle.

As a practical matter, requiring a water supplier to collect data on pumping throughout a groundwater basin would impose an enormous if not impossible burden on the water supplier, particularly given the relatively brief timeframe required to complete a WSA. (§ 10910, subd. (g)(2) [WSA must be submitted within 90 days, with one 30-day extension allowed].) Because groundwater is not regulated by the state, information on it is limited. According to the DWR, a groundwater budget, which measures a basin's inflows and outflows to determine the change in groundwater storage is a useful tool to understand a basin, "but detailed budgets are not available for most groundwater basins in California." Simply put, information on pumping throughout groundwater basins is not readily available. Moreover, some groundwater basins are massive, such as the Sacramento Valley Groundwater Basin, which includes 18 subbasins and extends from Red Bluff to the Sacramento-San Joaquin Delta. It is unlikely the Legislature intended that public water agencies study and analyze groundwater pumping in these huge basins simply to determine whether sufficient groundwater supplies are available for a proposed development project.

The infeasibility of conducting a basin-wide analysis of groundwater uses is evident in this case. The Santa Rosa Valley Groundwater Basin is large geographically and includes several different jurisdictions, including Santa Rosa, Healdsburg, Sebastopol, Rohnert Park, and Cotati. It would be difficult for any of these jurisdictions to conduct a basin-wide analysis of future groundwater sufficiency without a joint undertaking by, or at least the mutual cooperation of, all the jurisdictions. Furthermore, Sonoma County has over 40,000 private wells. Assessing water usage from these wells alone, much less including wells operated by other municipalities, would require a herculean effort in the limited timeframe in which a WSA must be completed.

Apparently recognizing the infeasibility of examining all groundwater uses in a basin, the trial court suggested it might be appropriate to restrict the inquiry to a subbasin. Limiting the analysis to a subbasin, however, does not solve the problem. First, the term "subbasin" does not appear in the statute. (See § 10910.) Second, while a subbasin is necessarily smaller than a groundwater basin, it still may be too large for a practical study of all users who take water from the subbasin. Third, and perhaps most importantly, there is no inherent hydrological significance in the delineation of a subbasin,

which may be created on the basis of political boundaries and other institutional factors rather than on the basis of hydrological factors. Thus, there is no guarantee that an analysis of an entire subbasin would necessarily generate meaningful results.

A WSA serves the limited function of providing information about groundwater sufficiency for a *specific, proposed development project.* (§ 10910(f)(5).) It is not a general planning document for the management of groundwater supplies in a basin. Mechanisms exist to manage and regulate water supplies, such as groundwater management plans (§ 10750 et seq.), the adoption of groundwater ordinances, and groundwater adjudications overseen by the courts. A broad inquiry into basin-wide conditions and uses may be a proper subject for such water management mechanisms, but it is not appropriate to impose that obligation upon water suppliers seeking to comply with section 10910, subdivision (f) and analyze groundwater sufficiency for a particular proposed project.

We are mindful, too, of the declared legislative intent of Senate Bill No. 610, which added section 10910(f)(5). The legislation sought to strengthen communication between water agencies and planning agencies in order to link water supply and land use planning decisions. (Stats. 2001, ch. 643, § 1(a)(9).) In addition, the Legislature intended to "strengthen the process" by which local agencies determine the adequacy of water supplies for meeting existing and future demands for water. (*Id.*, ch. 643, § 1(b).) Thus, the intent was to ensure that local agencies take water supplies into account when considering new development. It was not to impose upon water suppliers the burden of undertaking a basin-wide analysis of past and future groundwater conditions every time a local agency proposes a new development project.

Further, as our Supreme Court has observed, the generalized information that section 10910 mandates at the early stages of the planning process is replaced by firm assurances of water supplies at later stages. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 433–434 [53 Cal.Rptr.3d 821, 150 P.3d 709].) Requiring a water supplier to conduct a basin-wide groundwater analysis at the earliest stages of the planning process would, in effect, demand a level of certainty about water supplies in the WSA that is required, if at all, at a much later point in the land use planning and approval process.

D. *Sample Study Area and Study Methodology*

Section 10910(f)(5) does not prescribe a particular analytical method for assessing groundwater sufficiency. The statute thus affords substantial

discretion to the water supplier and its experts to select a methodology appropriate for assessing groundwater sufficiency for a proposed project. Furthermore, in our role as a reviewing court, we may not engage in a comparative analysis of methodologies employed by different experts. In technical matters requiring the assistance of experts and the use and interpretation of scientific data, we give substantial discretion to administrative agencies. (*Stauffer Chemical Co. v. Air Resources Board* (1982) 128 Cal.App.3d 789, 794–795 [180 Cal.Rptr. 550].) Our task is limited to determining whether the agency action is arbitrary, capricious, or entirely lacking in evidentiary support. (*American Board, supra,* 162 Cal.App.4th at pp. 547–548.) Thus, we decline OWL's invitation to compare the methodology employed in the WSA with methodologies employed in earlier studies, such as the one performed by PES in connection with the City's general plan EIR. It is not for this court to weigh the relative merits of different studies that have been performed in the Santa Rosa Valley Groundwater Basin.

Although OWL concedes that a study area used for a groundwater sufficiency analysis may be smaller than an entire groundwater basin, it nonetheless urges that the study area must possess certain characteristics. OWL asserts that a study area must be "representative" of the subbasin from which water to supply the proposed project will be pumped. According to OWL, in order for a study area to be representative of a larger subbasin, it must be contained within the accepted boundaries of the subbasin and must properly reflect recharge rates and water production levels throughout the subbasin. OWL goes so far as to suggest that a court must invalidate a WSA if the WSA's study area extends beyond the boundary of the relevant basin or subbasin as determined by DWR. In other words, in OWL's view, a WSA that relies on a study area extending beyond a groundwater basin's boundaries is insufficient as a matter of law. We disagree.

Borders of groundwater basins and subbasins as delineated by DWR do not necessarily provide sensible boundaries for evaluating the sufficiency of groundwater supply. As explained above, subbasin boundaries may be determined in part by political boundaries and institutional considerations. Furthermore, as DWR acknowledges, basin and subbasin boundaries are subject to modification as conditions change and more and better data are gathered. In addition, there is no reason to believe that pumping at one end of a groundwater basin will necessarily affect groundwater levels at the other end, particularly in a vast and complex groundwater basin. Even in the relevant subbasin here, the Santa Rosa Plain Subbasin, the DWR's 1982 study showed that groundwater levels were increasing in one part of the subbasin at the same time they were decreasing in another part.

As appellants point out, a groundwater basin is a complex natural resource and cannot be equated to a "bathtub" in which water drained from the bathtub

affects all water levels in the bathtub equally. The Santa Rosa Plain Subbasin, for example, contains geologic formations with varying hydrological characteristics. The DWR had concluded that the Santa Rosa Plain Subbasin is "extremely complex" and "extensively compartmentalized." The DWR stated that "[t]hese conditions result in a number of partially separated ground water bodies of differing characteristics." Although groundwater movement can be analyzed in localized areas within the subbasin, the DWR concluded that the characteristics of the subbasin make "generalities or predictions of ground water behavior . . . based on existing data . . . of questionable value." As a result, it cannot be assumed that groundwater pumping from a specific location will necessarily have a uniform effect on groundwater conditions and levels throughout the subbasin.

 For these reasons, we conclude that a DWR basin or subbasin boundary is not the only appropriate boundary for analyzing the sufficiency of a groundwater supply. DWR basin boundaries may conflict with hydrological realities. As a result, the local water supplier must have the discretion to make technical and practical determinations about the appropriate geographical area to support a WSA. That discretion is not boundless, however, and is subject to review to the extent the water supplier's decision to adopt a WSA is arbitrary, capricious, or entirely lacking in evidentiary support.

### E. The City's WSA Complies with Section 10910(f)(5)

 OWL argues that the WSA is legally inadequate because the study area extends beyond the boundary of the relevant subbasin. We have concluded that a WSA is not inadequate as a matter of law simply because the WSA's study area does not precisely conform to the boundaries of a subbasin. The question remains whether the boundaries chosen by the City's experts for its study area are so lacking in evidentiary support that the City's adoption of the WSA amounted to an abuse of discretion. Because we conclude there is adequate evidentiary support for the geographical study area relied upon by the WSA, we find no abuse of discretion.

OWL's primary complaint about the WSA study area is that it is based on watershed boundaries instead of DWR's groundwater basin boundaries.[9] As a

---

[9] It does not appear that OWL objected to the draft WSA on this ground when the WSA was under consideration by the City. Although the draft WSA plainly indicated that the watershed was chosen as the study area, in its letters and testimony before the City OWL did not claim the WSA was flawed because it used the watershed as the study area. If this were an administrative mandate proceeding in which we applied a substantial evidence standard of review (as OWL urges), we would decline to entertain OWL's argument on the ground it was waived. (See *Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 791 [32 Cal.Rptr.3d 177] [declining to entertain argument not raised in administrative

consequence of using the watershed boundary for the Laguna de Santa Rosa, the WSA study area extends beyond the boundary of the Santa Rosa Plain Subbasin into the hills to the east of the City. In addition, the study area extends slightly to the southwest of the Santa Rosa Plain Subbasin boundary. OWL asserts that a watershed is concerned with surface water flows, not groundwater basins, and is therefore an inappropriate geographical area for considering groundwater sufficiency. OWL also contends that the contours of the study area artificially inflated recharge and underestimated pumping. In effect, OWL argues that the study area is based on nothing more than an unsupported assertion that boundaries of groundwater basins generally match watershed boundaries.

As explained in the WSA, the study area boundary was based on official watershed boundaries shown on the California Interagency Watershed Map. Because the watershed in some areas extends beyond the boundary of the Santa Rosa Plain Subbasin, the study area necessarily extended beyond the subbasin boundary. The City's experts stated they chose the study area based on prior hydrologic studies and independent review and analysis of subsurface geologic conditions and available groundwater data. They explained that the study area was almost identical to one used by hydrologists in a 2004 study—referred to as the Todd study—that was prepared by Sonoma County for an EIR associated with a residential development near the City.

Considered in isolation, the section of the WSA that describes the study area is insufficient to justify the use of the watershed as the study area. It is not enough simply to assert that an expert's "independent review" confirms the propriety of the study area, even if it matches the study area used by another expert. There must be evidentiary support for the selection of the study area. Here, the record contains such support.[10]

In the WSA, the City's experts explain that "[t]he data . . . indicate a groundwater divide in the general vicinity of the watershed boundary." The WSA also contains a more extended discussion of the relationship between the watershed and the groundwater divide based on prior studies and contour maps of groundwater elevation. Thus, the selection of the watershed as the study area appears to be based on an analysis of empirical data rather than an unsupported assumption.

Support for the choice of study area is found in the Todd study, which is contained in the administrative record. The WSA's study area is similar to the

---

hearing].) Although we will consider OWL's argument here, our review is governed by the deferential standard applicable to traditional mandamus actions.

[10] In order to determine whether there is adequate evidentiary support for the WSA, we consider the entire administrative record. (See *San Franciscans Upholding the Downtown Plan v. City and County of San Francisco, supra*, 102 Cal.App.4th at p. 674.)

one used by the Todd study. In the Todd study's discussion of the study area, it was noted that "[a]n important assumption is that the surface water drainage divides that define the watershed also generally represent groundwater divides." The Todd study explained the assumption was "reasonable for the high bedrock ridges on the eastern and southwestern margins of the basin." The Todd study also compared the watershed map to available groundwater contour maps to confirm the relationship between watershed and the groundwater divide.

Several of DWR's own study areas extended beyond the Santa Rosa Plain Subbasin. DWR studies conducted in 1979 and 1982, for example, included study areas extending into the neighboring groundwater basin, just as the WSA study area does. In addition, the 1979 DWR report, like the WSA, included a study area extending beyond the eastern part of the subbasin boundary into the hills east of the City.[11]

There was plainly a rational reason for choosing the particular study area used in assessing groundwater sufficiency for the WSA. OWL may debate the relative merits of using the watershed as the study area, but the fact remains that the choice of study area was not arbitrary, capricious, or completely lacking in evidentiary support.

Furthermore, even if we were to find the choice of study area to be legally inadequate, we would nonetheless conclude the WSA satisfied the requirements of section 10910(f)(5). This is so because the WSA's sufficiency analysis was based on two different empirical analyses—(1) a water budget model and (2) an examination of the correlation between pumping and groundwater levels. The water budget model, which accounted for groundwater flows into and out of the study area, could potentially have been skewed by the improper inclusion of areas with high recharge potential (i.e., precipitation). However, the examination of the correlation between pumping and

---

[11] The City attached to its reply brief a map purporting to illustrate the boundaries of various study areas that have been used to assess groundwater conditions in the Santa Rosa Plain Subbasin. OWL seeks to strike the attachment, claiming the map is not contained in the administrative record and was not before the City when it approved the WSA. (See *Western States Petroleum Assn. v. Superior Court, supra*, 9 Cal.4th at pp. 578–579 [with limited exceptions, extra-record evidence inadmissible in traditional mandamus actions].) The City's map represents an attempt to combine six different maps that are contained in the administrative record. OWL contends there is no way to verify the relationship among the maps and confirm that the boundary representations are accurate. Because the map attached to the City's reply brief is not found in the administrative record, we will not consider it as evidence supporting the adoption of the WSA. However, we observe that, although one cannot determine with precision the relationship among the various study areas by looking at the six individual maps the City attempted to combine into one map, when viewed together the individual maps nonetheless support the conclusion that study areas used to analyze groundwater have not always coincided with the boundary of the subbasin as mapped by DWR.

groundwater levels was not dependent upon recharge estimates that might be exaggerated by an improper study area. Both methods of analysis "provide similar estimates . . . from a combination of sources" and produce consistent conclusions. Thus, even if the choice of study area were legally inadequate, there would be an independent basis to conclude the WSA's groundwater sufficiency analysis satisfied section 10910(f)(5).

Accordingly, the trial court erred in concluding the WSA was legally insufficient.

### DISPOSITION

The judgment is reversed. Appellants shall recover their costs on appeal.

Siggins, J., and Jenkins, J., concurred.