Filed 5/14/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| STEVEN L. GOMES,<br><br>　　　Plaintiff and Appellant,<br><br>v.<br><br>MENDOCINO CITY COMMUNITY<br>SERVICES DISTRICT,<br><br>　　　Defendant and Respondent. | A153078<br><br>(Mendocino County<br>Super. Ct. No.<br>SCUK-CVPT-15-65985) |

　　　Steven L. Gomes, a homeowner in Mendocino County, appeals an adverse judgment rejecting his petition to invalidate an ordinance of the Mendocino City Community Services District (the district) limiting the quantity of groundwater he may extract from his property. He contends that the statute authorizing the district to establish groundwater-management programs does not give it authority to impose extraction limits but that, if it does, the district failed to adopt the present program in accordance with the procedures specified in the statute. We conclude that the statute does authorize the imposition of extraction limitations but that the district did not adopt its program as the statute requires. The present ordinance therefore must be invalidated, without prejudice to re-adoption of such a program in accordance with the statutorily mandated procedures.

**Factual and Procedural History**

　　　The town of Mendocino lies on a peninsula, bounded by cliffs. It lacks a source for a community-wide water system, so its residents depend on groundwater drawn from wells. In 1972, the district was created under the Community Services District Law (Gov. Code, § 61000 et seq.) for the purpose of regulating local wastewater—not groundwater. In 1985, the California Department of Water Resources published a study

1

of Mendocino's groundwater basin. It concluded that the town's water demands exceed supply during dry years and some normal years, and that new wells should not be permitted without pump tests.

In 1986, the Legislature passed Assembly Bill No. 792. That act would have authorized any local agency providing water service in Mendocino, or any of 11 specified groundwater basins around the state that were "subject to critical conditions of overdraft," to "establish . . . programs for the management of groundwater resources . . . in accordance with prescribed procedures." Governor Deukmejian vetoed Assembly Bill No. 792 as "overbroad," deeming it "more appropriate" for local agencies in such basins to petition the Legislature for such authority "on a case-by-case basis."

Accordingly, in 1987, the Legislature added to Division 6 of the Water Code a new part 2.7 applying "only to the area within the existing boundaries of the Mendocino City Community District." (Stats. 1987, ch. 472, § 1; Wat. Code, § 10700 et seq. (the Act).)[1] The Act provides that the district "may, by ordinance, . . . establish programs for the management of groundwater resources." (§ 10702.)[2] To do so, the district must follow a prescribed multi-step process. The district must first hold a noticed public hearing "on the proposed groundwater management program" at which the board may alter the program or require more study, and after which it may "adopt a resolution of intention to adopt and implement the program." (§ 10703.)[3] If it adopts such a resolution, it must publish the

---

[1] All statutory references are to the Water Code.

[2] Section 10702 reads: "Any local agency which is authorized by law to provide water services may, by ordinance, or by resolution if the local agency is not authorized to act by ordinance, establish programs for the management of groundwater resources."

[3] Section 10703 reads: "Prior to the adoption of a groundwater management program, the governing board of the local agency shall hold a public hearing, after publication of notice pursuant to Section 6066 of the Government Code, on the proposed groundwater management program. At the hearing, the board may alter the program or require further study on the program and continue the hearing. At the conclusion of the hearing, the board may adopt a resolution of intention to adopt and implement the program."

2

proposed program in a newspaper (§ 10704)[4] and hold a second hearing to "consider protests to the implementation of the program," at which "any eligible registered voter of the [district] may file [or withdraw] a written protest" (§ 10705).[5] If more than 50 percent of voters file protests, "the groundwater management program shall be abandoned," and the board may not consider a new program for one year. If a majority does not protest, the board "may adopt an ordinance or resolution to implement the program." (§ 10706.)[6]

The Act also authorizes the district to "fix and collect rates for the extraction of groundwater" (§ 10708) and to "levy a water replenishment assessment" (§ 10709). In order to do either, the district must "hold an election on the proposition of whether or not [it] shall be authorized to levy a water replenishment assessment or to fix and collect [extraction] rates." (§ 10710.)

In a letter urging the governor to sign Assembly Bill No. 786, its author explained its origins and purpose: "The village of Mendocino has no central water system and operates entirely off of private wells. In recent years, some developments have dug wells deeper into the water table than existing wells, causing many residents to be without

[4] Section 10704 reads: "After the conclusion of the hearing, and if the governing board adopts a resolution of intention, copies of the groundwater management program shall be published in a newspaper of general circulation. Upon written request, any interested person shall be provided with a copy of the program."

[5] Section 10705 reads: "After the adoption of a resolution of intention, the governing board shall hold a second hearing and consider protests to the implementation of the program. Any interested person may appear to be heard concerning any matter set forth in the resolution or matters material thereto. Any time prior to the conclusion of the hearing, any eligible registered voter of the local agency may file a written protest or withdraw a protest previously filed."

[6] Section 10706 reads: "A majority protest shall be determined to exist if the governing board finds that the protests filed and not withdrawn prior to the conclusion of the second hearing represent more than 50 percent of the eligible registered voters residing within the boundaries of the local agency. If the governing board finds that a majority protest exists, the groundwater management program shall be abandoned and no new program shall be considered by the board for a period of one year following the date of the second hearing. If a majority protest has not been filed, the board, within 35 days after the conclusion of the second hearing, may adopt an ordinance or resolution to implement the program."

water for as much as two to three months a year, even in wet years . . . . [¶] AB 786 would permit [the district] to adopt a water management program through public hearings *to regulate new development relative to water availability and the impact on neighbors*."[7] (Italics added.)

In 1990, in compliance with the procedures specified in sections 10703 through 10706, the district adopted Ordinance No. 90-1, the "groundwater extraction permit ordinance," which states that it is "the first component of a comprehensive groundwater management program." The ordinance requires a property owner to obtain a groundwater extraction permit for the extraction of groundwater "for 'new development' or 'change in use' "or "from a well constructed or modified following the adoption of this ordinance within the boundaries of [the district]." In most instances, and subject to detailed specifications, the applicant must arrange a hydrological study to determine if the well will adversely affect other wells, and must install a water meter and accept an "allotment" defining the quantity of water that may be extracted. Extraction exceeding that amount is a misdemeanor subject to daily fines.

Since adopting Ordinance No. 90-1, the district has enacted further groundwater-management measures without following the procedure specified in sections 10703 through 10706. In January 2007, for example, the district adopted Ordinance No. 07-01, requiring a property owner to obtain a permit and allotment after a property is sold, even if no new construction or change in use results.

Later in 2007, the district adopted the two measures primarily at issue on appeal: resolution No. 200, which adopted a water shortage contingency plan, and Ordinance No. 07-04 which implements the plan.[8] The plan was created "to establish criteria for

---

[7] The letter concluded by stating incorrectly that "such a management plan would be subject to a majority vote of the residents of the district," whereas, as noted, the Act subjects a proposed groundwater management program to a majority-protest procedure (§ 10706).

[8] Gomes also seeks to challenge Ordinance No. 2018-002, which the district adopted after entry of the judgment. Consideration of this ordinance is beyond the scope of this appeal.

4

when to declare a water shortage through four (4) stages of alert and action, and to identify appropriate conservation measures and response actions for each water shortage stage to protect the water resources of the district." The plan describes four levels of water shortage criteria and the resulting measures that are to be taken at each level of water shortage. If the district declares a stage 4 "water shortage emergency," "all property owners within the district with developed parcels shall be required to obtain a groundwater extraction permit with an allotment."[9] As Gomes notes, a stage 4 declaration acts as a "one-way ratchet": It triggers the requirement that all property owners obtain permits and allotments, and that requirement remains in effect in perpetuity, even after the drought ends.

The district's brief advises that the water shortage contingency plan "was the subject of a number of public hearings where testimony was received by the board of directors of the [district] that promoted the idea that in a truly historic drought (Stage 4) every developed property in the district should share the burden associated with reduced availability of groundwater." Nonetheless, the district acknowledges that "[i]t is undisputed the district did not follow the procedure set forth in Water Code §§ 10703-10706 when adopting Ordinances 07-1 and 07-04, and Resolution No. 200."

From February 2012 through December 2013, the district successively declared stage 1 through stage 3 water shortages. On February 24, 2014, the district's board of directors adopted resolution No. 2014-231 declaring that "under the current water shortage conditions," a stage 4 water shortage emergency condition "exists within the area served by the [district]" and directing implementation of "demand management as

---

We therefore deny his request that we take judicial notice of the subsequent ordinance, and of other documents, on the ground of irrelevance.

[9] Further, during the stage 4 water shortage emergency, "all allotments shall be reduced by 40 percent. The notification [to the property owner] shall also include a listing of potential water conservation and water use reduction measures, and an advisory that [the district] staff is available upon the written request of the property owner to conduct an audit of water usage and to make specific recommendations and additional conservation measures."

5

defined in the [district] water shortage contingency plan under stage 4." In April 2014, the district sent a letter to Gomes requiring him, for the first time, to obtain a permit. He objected and demanded a hearing, and the board held one in November 2014, at which it concluded that he was obliged to obtain a permit. It promptly sent him a notice of violation demanding that he get a permit or face enforcement action and a $100 per day charge.

The district lowered the drought level to stage 1 in December 2014 and to "No Water Shortage Condition" in February 2015. But since the stage 4 declaration had triggered the permit and allotment requirements, the district sent Gomes a second notice of violation in January 2015. He again requested a hearing, and the district again affirmed its position. The district sent a third notice of violation subjecting Gomes to daily fines of $350. The district then began to impose such fines, which eventually mounted to a total of $35,300.

Gomes filed this action in June 2015, seeking a writ of mandate, declaratory relief, and damages. He alleged that the district "seeks to force Gomes to put a meter on a groundwater well, which is nearly 100 years old and has been in Gomes's family that entire time, and submit to the district's regulatory authority to limit the amount of water Gomes can withdraw from his well regardless of either of the supply of water available or Gomes's need for the water." In addition to alleging that the district had not complied with its own contingency plan and had violated state and federal constitutional requirements, Gomes's first amended complaint alleges that the district "did not follow the notice, hearing and publication requirements set forth in . . . §§ 10703 and 10704 in adopting the contingency plan or resolution 2014-231."

After requesting briefing on "whether the Legislature intended the enhanced enactment procedures to apply to the enactment of all ordinances relating to a groundwater management plan or only to the enactment of the initial ordinance," the court held that the Act required the district to use the "enhanced enactment procedures" only once, in adopting its first groundwater management program. Following a bench trial in which the court rejected Gomes's causes of action for declaratory relief and damages, the

6

court issued a statement of decision holding that the adoptions of the water shortage contingency plan and of Ordinance No. 07-04 were "authorized by [section] 10700 et seq. The district provided appropriate notice and opportunities for citizen participation prior to adopting the plan and Ordinance No. 07-4, and its decision was based upon substantial, reliable scientific evidence. The district's decision to require all landowners within the district to obtain a groundwater extraction permit and abide by water allotments was rationally related to a legitimate governmental purpose."[10] The court entered a judgment holding that the adoption of Ordinance Nos. 07-01 and 07-04 was valid, and Gomes timely appealed.

**Discussion**

1.    *The district may limit groundwater extraction within its groundwater management program*

Gomes first argues that the Act cannot be read to give the district authority to impose limits on property owners' right to extract groundwater from their own land. Although the district correctly argues that Gomes failed to make this argument in the trial court, both parties have briefed the issue, it raises a pure question of law, and we deem it advisable to address the issue on the merits.[11]

---

[10] The court also held that the permit and allotment requirements do not violate a constitutional provision requiring that water be put to beneficial use (Cal. Const., art. X, § 2) and did not effect a regulatory taking. On appeal, Gomes does not challenge these rulings.

[11] The district argues that the judgment should be affirmed on the ground that Gomes did not exhaust his administrative remedies by applying for an expanded allotment for his land. While the trial court held that Gomes failed to exhaust administrative remedies with respect to his claim that the district "violated his due process right to a hearing regarding [his] request for a water allotment that would support agricultural use," it did not hold the same with respect to his attack on the validity of the district's regulations. In all events, the district waived the defense of exhaustion in its answer, in which it "admits that Gomes has exhausted all available administrative remedies." "The defense of failure to exhaust administrative remedies may be waived." (*Mission Housing Development Co. v. City and County of San Francisco* (1997) 59 Cal.App.4th 55, 63; accord, *Cummings v. Stanley* (2009) 177 Cal.App.4th 493, 505–506; *O.W.L. Foundation v. City of Rohnert Park* (2008) 168 Cal.App.4th 568, 584; but see *Hood v. Hacienda La Puente Unified School*

7

Several statutes conferring groundwater management authority on different local agencies expressly confer the power to impose extraction limits (e.g., Wat. Code Appen., §§ 121-701, 128-708, 129-708), and some confer that power subject to explicit preconditions for its exercise (e.g., § 10753.9, subd. (c)). The Act before us does not specifically authorize the district to impose extraction limits, leading Gomes to argue that we should infer from the absence of such a provision that the district was not granted such authority. The district, on the other hand, argues that the express authorization of such limits in these other statutes confirms the Legislature's view that such limits are inherently among the permissible components of a groundwater management program.

We agree that the authority to manage groundwater necessarily includes the ability to limit the quantity of water that individual users may extract. The authority to issue extraction permits and to include conditions in those permits—which unquestionably are encompassed within the authority to manage the groundwater—would be ineffectual, if not entirely meaningless, without the authority to impose limits. The Act in question is relatively brief and concise; it does not specify many of the powers that other groundwater management statutes do spell out. (E.g., Wat. Code Appen., § 121-701 [conferring powers to require conservation practices; regulate, limit, or suspend extractions and construction or enlargement of extraction facilities; prosecute legal actions; impose spacing requirements on new extraction facility construction; and impose reasonable operating regulations].) All such powers are presumably included within the authority to manage groundwater. The fact that the Act does not specify the power to limit extraction is no more an indication that the district lacks such power than that it lacks authority to use any of the other management tools that are articulated in other statutes. Gomes cites no judicial decision or other authority suggesting that when the Legislature grants authority to manage groundwater, it must specify precisely what

_____

*Dist.* (1998) 65 Cal. App. 4th 435, 440–441 [noting traditional view that exhaustion may be raised at any time].)

8

powers are included or the power does not exist.[12] Nor does he cite any legislative history or other material suggesting that the Legislature intended to withhold the power to limit extractions from the general grant of authority to manage the groundwater resources within the boundaries of the district.

We thus conclude that the authority to manage the district's groundwater resources includes the authority to impose extraction limitations on users of the groundwater.

2.    *The district's groundwater management program was not adopted in compliance with the requirements of the Act.*

Although the Act authorizes the district to "establish programs for the management of groundwater resources" (§ 10702) that may include extraction limitations, it may do so only if the programs are adopted pursuant to the notice, hearing and protest procedures specified in the Act. As noted above, the district acknowledges that the water shortage contingency plan, resolution No. 200 and Ordinance No. 07-04, were not adopted pursuant to the procedures specified in section 10703 through 10706. The district contends, and the trial court agreed, that adoption of Ordinance No. 90-1 in 1990 in compliance with those procedures was sufficient, and that the subsequent enactments were merely amendments of the original program that need not have been adopted in conformity with those procedures.

The trial court concluded that "the Legislature intended the enhanced ordinance adoption procedures of [sections] 10703-10706 to apply only to the enactment of the ordinance adopting the *initial* water management program, representing the assumption

_____

[12] At oral argument, Gomes's counsel highlighted his citation to *G. L. Mezzetta, Inc. v. City of American Canyon* (2000) 78 Cal.App.4th 1087, 1092, which stated that "[t]he powers of a general law city include ' "only those powers expressly conferred upon it by the Legislature," ' " with certain exceptions, and that such powers " ' "are strictly construed, so that 'any fair, reasonable doubt concerning the exercise of a power is resolved against the corporation.' " ' " Assuming that this principle applies to the district, the statute in question does not confer specific powers that allegedly have been exceeded. The Act confers authority on the district to "establish programs for the management of groundwater resources" (§ 10702) and the question is whether a limit on extraction is a component of such a program.

by the Community Service District of power not otherwise within its authority. The court finds that the Legislature did not intend the same enhanced ordinance adoption procedures to apply to the subsequent adoption of ordinances amending that initial ordinance. The court cannot find any stated intent, rationale or public policy to support the argument that the Legislature intended the enhanced ordinance adoption procedures to apply to all ordinances implementing changes in the initially adopted water management plan." According to the court, "To construe the language to require the enhanced procedures for *any* ordinance subsequently amending and modifying the initial adopted program would render the operation of a management plan unnecessarily and unreasonably unwieldy. A district would have to comply with the enhanced adoption procedure for even the most minor amendment, regardless of how insubstantial. It is extremely unlikely that the Legislature intended any amending ordinance, however inconsequential, to be subject to the majority protest process and the mandatory one year delay."[13]

The trial court's interpretation disregards the text of the Act. Nothing in the statute limits its mandatory procedures to the enactment of an "initial" water management program. To the contrary, section 10702 states that the district "may . . . establish program**s** for the management of groundwater resources," (emphasis added) and sections 10707 and 10709 repeat that the district may be authorized to establish multiple "program**s.**" Section 10703, on the other hand, states that, "[p]rior to the adoption of **a** groundwater management progra**m**," (emphasis added) the agency shall follow the process specified. Similarly, sections 10704, 10705, and 10706 all refer to procedures for

---

[13] The court also stated that the district "is not authorized to assume the *additional* authority offered by the Legislature in Stats. 1987, ch. 472, sec. 1, until the voters have agreed to become subject to that *new* authority as expressed in the initial management plan." However, the court appears to have conflated two provisions. Voter approval is not required for adoption of a groundwater management program; rather, compliance with the "enhanced adoption procedure" specified in sections 10703 through 10706 is required. Voter approval is necessary only to assume the power to levy a water replenishment assessment or to assume the power to fix and collect payment rates under sections 10708 or 10709. (See § 10710.)

10

consideration and adoption of a "program," in the singular. The reference to "program**s**" indicates that the district may establish more than one such program, and that each is not to be considered an amendment of the initial program. The reference to the procedures for adopting "**a** groundwater-management program " (rather than "**the** groundwater-management program") indicates that each such program must comply with the specified procedures.

Moreover, the obvious policy underlying the Act is to permit the property owners who will be affected by a groundwater management program to participate meaningfully in the development of the program and to reject the program unless more than half approve. Whether or not the hearings before adoption of the water shortage contingency plan provided property owners the same opportunity to comment as the procedures required by the Act, which is questionable, the plan was adopted without giving the majority of the eligible residents the opportunity to reject the plan, as the statute requires.

Even if the trial court is correct that inconsequential amendments may be made to a program without complying with the procedural requirements of the Act, the water shortage contingency plan adopted by the district is hardly such an inconsequential amendment. However minor amendments may be defined, and we need not articulate a universal definition here, the water shortage contingency plan cannot possibly be regarded as a minor amendment of Ordinance No. 90-1. The 1990 ordinance simply required an extraction permit for a new development or change in use of land, or the construction of a new well or modification of an existing well. The 2007 water shortage contingency plan created an entirely new program, involving, among other things, criteria for stages of water shortage, implementation of various water demand reduction methods, prohibitions and penalties depending on the stage of water shortage, the requirement that at stage 4 owners of wells previously operated without permits or water allotments obtain permits and be subject to allotments, and that those owners remain subject to those requirements even after termination of the water shortage. None of these significant and far-reaching measures was considered or approved, explicitly or implicitly, with the adoption of the modest 1990 program. Before enactment of the entirely new water

11

shortage contingency program, the Act requires what the trial court appropriately termed an "enhanced adoption procedure." Affected property owners are entitled to prior notice of the proposed program, a public hearing offering the possibility for alteration or further study of the program, a second hearing and consideration of protests to the program, and abandonment of the program if more than 50 percent of the eligible residents oppose the program. Had the district observed these procedures before adopting resolution No. 200 and Ordinance No. 07-04, we cannot say whether changes would have been made in the program or that the program would not have been entirely abandoned. Therefore, the adoption of those measures was invalid, and the measures are void.

Gomes also challenges the validity of Ordinance No. 07-01. Whether this ordinance should be regarded as simply a minor modification of the program adopted by Ordinance No. 90-1, or a new program requiring compliance with the procedures specified in the Act, presents a closer question. Ordinance No. 07-01 added to the requirement that an extraction permit be obtained for new development or a change in use of property, or for construction or modification of a well, the requirement that a permit be obtained "following the sale of real property within the boundaries of the [district]." Because this ordinance for the first time extended the permit process to existing wells that were not being modified, we conclude that the enhanced procedures of the Act should have been observed. Moreover, since our invalidation of resolution No. 200 and Ordinance No. 07-04 presumably will instigate the process specified in the Act for the re-adoption of a water shortage contingency plan, inclusion of the Ordinance No. 07-01 provisions should be easily accomplished.

In view of these determinations, we need not consider additional issues raised by the parties. On remand, however, we do not preclude reconsideration of other rulings made by the trial court on the erroneous premise that resolution No. 200 and Ordinance No. 07-04 had been validly adopted, including Gomes' motion for attorney fees.

**Disposition**

The judgment is reversed with directions to issue a declaratory judgment declaring that Ordinance No. 07-01, resolution No. 200, and Ordinance No. 07-04 are void because

12

they were not adopted in the manner prescribed by Water Code sections 10703 through 10706, and for further proceedings consistent with this opinion. Gomes shall recover his costs incurred on appeal.

POLLAK, P. J.

WE CONCUR:

STREETER, J.
TUCHER, J.

13

Trial court:                          Mendocino County Superior Court

Trial judge:                          Honorable Cindee F. Mayfield

Counsel for plaintiff and appellant:     DOWNEY BRAND LLP
                                      Kevin M. O'Brien
                                      David E. Cameron

                                      CARTER MOMSEN PC
                                      Colin W. Morrow

Counsel for defendant and respondent:   James A. Jackson

                                      Matthew Emrick

A153078

14